IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALONZO SMITH, | ) |
| | ) |
| Plaintiff, | ) No. |
| | ) |
| vs. | ) |
| | ) Judge |
| | ) |
| Former Chicago Police Department Commander JON | ) |
| BURGE; Mayor and former State's Attorney | ) |
| RICHARD M. DALEY; former Chicago Police | ) |
| Department Sergeant JOHN BYRNE; former | ) |
| Chicago Police Department Detective PETER | ) |
| DIGNAN; former Cook County ASA PAUL KELLY; | ) |
| the Estate of LEROY MARTIN; former Chicago Police | ) |
| Department Superintendent TERRY HILLARD; | ) |
| former OPS Director GAYLE SHINES; former aide to | ) |
| the Chicago Police Department Superintendent | ) |
| THOMAS NEEDHAM; CITY OF CHICAGO; and | ) |
| COOK COUNTY, ILLINOIS; | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff ALONZO SMITH, for his complaint against former Chicago Police Commander

JON BURGE; Mayor of the City of Chicago and former State's Attorney of Cook County

RICHARD M. DALEY; former Superintendent of the Chicago Police Department TERRY

HILLARD; the Estate of former Superintendent of the Chicago Police Department LEROY

MARTIN; former Director of the Chicago Police Department's Office of Professional Standards

GAYLE SHINES; former Chicago Police Sergeant JOHN BYRNE; former Chicago Police

Detective PETER DIGNAN; former Cook County Assistant State's Attorney PAUL KELLY;

former aide to the Chicago Police Superintendent THOMAS NEEDHAM; the CITY OF

CHICAGO; and the COUNTY OF COOK, ILLINOIS, alleges as follows:

## I.    INTRODUCTION

1.    Plaintiff ALONZO SMITH spent nearly 20 years incarcerated in the Illinois

Department of Corrections because he was wrongfully convicted of the murder and armed

robbery of James Fullilove, crimes he did not commit.  Plaintiff was falsely arrested and charged

with this crime by Sergeant John Byrne and detective Peter Dignan, at the direction of disgraced,

and now convicted, former Chicago Police Commander Jon Burge, after Byrne and Dignan

sadistically tortured Plaintiff in the basement of Area 2 Police Headquarters. This torture forced

Plaintiff to falsely confess to these crimes.

2.    The miscarriage of justice in Plaintiff's case was not an isolated occurrence.  Rather,

it was part of a pattern and practice of systemic torture and physical abuse of African American

suspects at the Area 2 and, later, at the Area 3 Police Headquarters under Burge's command and

supervision.  Plaintiff's torture, wrongful prosecution and false imprisonment occurred and

continued because command personnel in the Chicago Police Department (hereinafter "CPD"),

successive Superintendents of Police and several Mayors of the City of Chicago, most notably

former Mayor Richard M. Daley,  as well as Cook County, its State's Attorney, and its State's

Attorneys' Office, all concealed and suppressed their knowledge of ongoing torture and physical

abuse under Burge, blocked and undercut all efforts to expose, discipline, and prosecute

offending officers, and refused to intervene to stop the continuing egregious and criminally

unconstitutional  misconduct.

3.     Plaintiff seeks damages for the grievous injuries inflicted upon him from the persons responsible for this egregious miscarriage of justice.

## II.     JURISDICTION AND VENUE

4.     The actions of the Defendants violated the United States Constitution, the Civil Rights Act, 42 U.S.C. §§ 1983, as well as Illinois law.  This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and over his state law claims pursuant to the court's supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

5.     Venue is proper in this District under 28 U.S.C. § 1391(b).  The parties reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiff's claims also occurred in this judicial district.

## III.     PARTIES

6.     Plaintiff Alonzo Smith is an African American man, and a citizen of the United States.

7.     Defendant Jon Burge was a duly appointed and sworn Chicago Police Lieutenant and was, from 1982 to August of 1986, the commanding officer of Chicago Police Area 2 Detective Violent Crimes Unit.  In 1988, Burge was appointed Commander of Area 3 Detective Division by Defendant Martin and held this assignment until November of 1991, when he was suspended and, ultimately, fired by the CPD for the torture and abuse of Andrew Wilson. Defendant Burge engaged in a pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives and supervisors, including, but not limited to, the police officer Defendants named

herein. Defendant Burge, who was the supervising Lieutenant of Defendants Byrne and Dignan, on, before, and after January of 1983, was, on June 28, 2010, convicted of perjury and obstruction of justice for falsely denying that he participated in, was aware of, and supervised police torture. Burge engaged in the conduct complained of in the course and scope of his employment, and is sued in his individual capacity.

8.     Defendant John Byrne was a duly appointed and sworn Chicago Police Sergeant in the Chicago Police Area 2 Detective Violent Crimes Unit from 1982 to August of 1986, supervisor of the Unit's notorious midnight shift, also known as the "A Team" and Burge's Asskickers," and the direct supervisor of Defendant Dignan, who also worked on the midnight shift of the Area 2 Violent Crimes Unit. From 1988 to 1991, Byrne was a sergeant in the Violent Crimes Unit of Area 3, also under Burge's command. He engaged in the conduct complained of in the course and scope of his employment, and is sued in his individual capacity.   Defendant Byrne, like Defendant Burge, engaged in a pattern and practice of torture and brutality, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives, including, but not limited to, Defendant Dignan.

9.     Defendant Peter Dignan was a duly appointed and sworn Chicago Police detective who was assigned to the Detective Division at Area 2 Violent Crimes Unit under Defendant Burge's command; engaged in a pattern and practice of torture and brutality, often with Sergeant Byrne, and engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

10.    From 1987 to 1992, Defendant Leroy Martin was the Superintendent of Police for

4

the City of Chicago, and as such was responsible for the policies, practices, and customs complained of herein. In 1983 and early 1984, he was Commander of the Area 2 Detective Division and was thereby Defendant Burge's direct supervisor, as well as the command supervisor of Defendants Byrne and Dignan. He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

11.     From 1998 to 2004, Defendant Terry Hillard was the Superintendent of Police for the City of Chicago, and as such was responsible for the policies, practices, and customs complained of herein. He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

12.     From 1998 to 2002, Defendant Thomas Needham was counsel to, and administrative assistant for, Defendant Hillard, who was his direct supervisor. Defendant Needham engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

13.     From 1981 to 1989, Richard M. Daley was the State's Attorney of Cook County and during that period was responsible for the policies, practices and customs of that office. From 1989 to 2011, Defendant Daley was the Mayor of the City of Chicago and as such was a chief policymaker for the City of Chicago, its Police Department, City Council, Corporation Counsel's Office, and Police Board and was and is therefore responsible for the policies, practices, and customs complained of herein. Defendant Daley was acting in the scope of his employment at all times material to this complaint and is sued in his individual capacity.

14.     From 1990 to 1998, Defendant Gayle Shines was the Director of the Office of

5

Professional Standards (hereinafter "OPS") of the CPD. Her direct supervisor was the Chicago Police Superintendent. She was appointed by Defendant Daley, engaged in the conduct complained of in the course and scope of her employment, and is sued in her individual capacity.

15.     Defendant City of Chicago is an Illinois municipal corporation, and as such is responsible for the policies, practices and customs of the CPD, its OPS, its Personnel Division, its Detective Division, and its Superintendent of Police, as well as those of the Mayor, his office, and his City Council, the Corporation Counsel's Office, and the Chicago Police Board. The City of Chicago is and/or was the employer of each of the Defendant Officers and police and governmental officials. The City of Chicago is responsible for the acts of the Defendant Officers and Defendant police and governmental officials while employed by the City of Chicago and while acting within the scope of their employment.

16.     Defendant Paul Kelly was an Assistant Cook County State's Attorney assigned to the Felony Review Unit of the Cook County State's Attorneys' Office (hereinafter referred to as the "CCSAO"). He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

17.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its CCSAO and the Cook County Board. At certain times relevant to this action, Cook County was the employer of Defendants Daley and Kelly and is therefore a necessary party to this lawsuit.

18.     At all times relevant to this action, each of the named individual Defendants acted under the color of the laws, regulations, and customs of the State of Illinois. Each Defendant's

actions constituted "state action" as defined under federal law.

## IV.     FACTUAL ALLEGATIONS

### A.     Plaintiff Smith's Arrest and Torturous Interrogation

19.     On January 18 or 19, 1983, James Fullilove was found dead in his apartment in Chicago, Illinois.

20.     Detectives from Area 2 Violent Crimes Division, including Defendants Byrne and Dignan, were responsible for investigating Mr. Fullilove's death.

21.     Defendant Burge was the lieutenant responsible for leading the Fullilove investigation.

22.     On January 21, 1983, at approximately noon, Plaintiff voluntarily went to Area 2 Police Headquarters with a friend, after he learned that Chicago Police Officers had been to his house, left him a card and asked to speak with him about James Fullilove.

23.     After Plaintiff was interrogated for hours by Area 2 detectives, Defendants Byrne and Dignan were contacted at home, were informed of the status of the investigation, and that evening, arrived at Area 2.

24.     Defendant Burge talked to Plaintiff on two occasions at Area 2 prior to his being tortured, and told Plaintiff, after he denied involvement in the crime, that he would talk "one way or the other" "before the night was over with," and that they "had ways of making [him] talk."

25.     Subsequently Defendant Dignan confronted Plaintiff in an interrogation room on the second floor of Area 2, told him to get up, and said "we're going to have a real conversation now."

7

26.     Defendants Dignan and Byrne proceeded to take Petitioner down the stairs to the basement at Area 2.

27.     Defendant Byrne then asked Defendant Dignan if he had "the stuff," and Dignan replied that he did, but some of it was in the car. Dignan left the police station and returned with a plastic bag that looked like a garbage bag.

28.     Defendant Dignan unlocked the door to the basement and both he and Defendant Byrne proceeded to take Plaintiff down to the basement where Dignan put the plastic bag on top of an icebox.

29.      Defendants Byrne and Dignan forced Plaintiff to sit in a metal, swivel chair in the basement and handcuffed his hands behind his back.

30.     Defendant Dignan then opened the gray plastic bag and brandished a black rubber nightstick 16-18 inches in length.  He asked Plaintiff if he knew CPD Officer Allen Davis, who was also in custody and later became Plaintiff's co-defendant, and Plaintiff responded "no."

31.     Defendant Dignan next told Plaintiff that he was lying, that he had been lying all day and that he wanted the truth. Plaintiff reiterated that he was telling the truth and had been all day.

32.     Defendant Dignan responded by saying that "he had all night" and that before Plaintiff "left the basement," Plaintiff would "tell them what they wanted to hear."

33.     Defendant Dignan then told Plaintiff he would give him one more chance to tell "the truth," and Plaintiff responded that he had been doing so "all day and all night."

34.     In response to Plaintiff's repeated assertions that he did not commit the crimes,

8

Defendant Dignan hit him several times between the legs with the rubber nightstick while he was seated and handcuffed, and Defendant Byrne kicked Plaintiff in the stomach. Both Dignan and Byrne also hit Plaintiff with their nightsticks on the palms of his hands and the back of his legs.

35.     Defendants Dignan and Byrne then pulled the plastic bag over Plaintiff's head, put what appeared to be a thick, brown rubber band around the bag, and told Plaintiff they were "going to show [him] how it was to suffocate a dope dealer."

36.     While the bag was over Plaintiff's head, Defendant Byrne kicked him in the stomach, and Defendant Dignan hit him in the stomach with his nightstick.

37.     The next thing Plaintiff recalled was getting off the floor with the bag removed from his head.

38.     Defendants Dignan and Byrne then picked Plaintiff up, put him back on the chair, told him that was "round one," and reiterated that they had all night. They also told Plaintiff to go ahead and scream because no one could hear him.

39.     Defendants Dignan and Byrne again asked Plaintiff about Davis and whether they committed the murder together. When Plaintiff responded that he did not kill the victim, Dignan and Byrne bagged and beat him again.

40.     The next thing Plaintiff remembered was getting off the floor again, with a bleeding lip and with blood on his clothes.

41.     Defendants Dignan and Byrne put him back in the chair and resumed their interrogation. Plaintiff truthfully told them once again that he did not commit the murder.

42.     Plaintiff then saw Defendants Dignan and Byrne preparing to bag and beat him

again so he said that he had enough of the beatings.

43.     Defendants Byrne and Dignan told him to "tell the truth" and Plaintiff asked what the truth was.

44.     Defendants Dignan and Byrne then told Plaintiff what to say and he repeated it back to them because he thought that if he told them "what they wanted," they would stop torturing him.

45.     Defendants Dignan and Byrne then told Plaintiff to tell the Assistant State's Attorney (ASA) the same thing he was forced to recite to them in the basement.

46.     Defendants Dignan and Byrne also told Plaintiff that if he was asked, he was to say he was treated fairly, and if he failed to do so, they would bring him back to the basement.

47.     Defendant Dignan then turned on a hose and washed the blood off Plaintiff's shirt, jacket and mouth, then brought him back upstairs to an interrogation room.

48.     As a result of Defendant Dignan and Byrne's torture and physical abuse, Plaintiff suffered severe pain and physical injuries about his head and body.

49.     In the early morning hours, Plaintiff met with Defendant ASA Paul Kelly in the presence of Defendants Dignan and Byrne and recited what he was told to say in the basement.

50.     Subsequently, when he was repeating the story in front of the court reporter, Petitioner forgot some of the details, and when he did so, Defendant Dignan handed notes to Defendant Kelly on cards that prompted Defendant Kelly to go over various parts of the story again.

51.     Defendant Kelly obtained a signed court-reported statement from Plaintiff and he

subsequently signed the statement.

**B.    Plaintiff's Wrongful Conviction**

52.    Defendants Dignan and Byrne memorialized Plaintiff's false and fabricated confession in official reports that omitted any mention of the fact that the confession was the product of the torture and fabrication. These false official reports were presented to the attorneys who prosecuted Plaintiff and were relied upon in order to secure Plaintiff's wrongful charging, prosecution, conviction and imprisonment.

**Plaintiff's Bond Hearing**

53.    On January 24, 1983, Plaintiff was brought to court for a bond hearing, and prior to the hearing he encountered Defendant Dignan, and informed him that he was going to tell the Court that he had been beaten.

54.    Defendant Dignan responded that no judge or jury was going to believe the word of a "nigger" over the word of a white police officer.

55.    Plaintiff subsequently testified at his bond hearing that he was beaten by two white police officers in the basement of Area 2 Police Headquarters, and he identified Detective Dignan, who was present in Court, as one of the detectives who physically abused him.

**Plaintiff's Suppression Hearing**

56.    On June 1, 1983, Plaintiff filed a pre-trial motion to suppress his inculpatory statements, alleging that they were involuntary and the result of a "grueling" interrogation, involving "severe" and "excessive police brutality" committed by Defendants Byrne and Dignan.

57.     At that hearing, Defendants Dignan, Byrne, and Kelly were called as witnesses by the Prosecutors.

58.     Prior to testifying at the motion to suppress hearing, Defendants Byrne and Dignan falsely informed the prosecuting attorneys that they did not physically or psychologically coerce Plaintiff into giving a false and fabricated confession.  They also deliberately withheld the fact that they created the fabricated confession Plaintiff subsequently repeated, and that they had tortured and physically coerced and fabricated false incriminating statements from other suspects in other cases.

59.     During the hearing, Defendants Byrne and Dignan falsely denied that they had physically abused Plaintiff in any way.

60.     Defendant Kelly denied being aware of the abuse.

61.     Defendants Byrne and Dignan were not confronted with other acts of similar torture and abuse that they had committed against other suspects while working in the Area 2 Violent Crimes Unit under Jon Burge's supervision, nor with the implements of their torture, including the bag and rubber nightstick used against Plaintiff introduced or admitted at the hearing, because this evidence had been suppressed and covered up by the Defendants.

62.     No evidence or findings of systemic Area 2 torture and abuse were available to, or offered by, Plaintiff.

63.     At the conclusion of the evidence, the trial judge denied Plaintiff's motion to suppress, accepting Defendants Dignan, Byrne and Kelly's false and perjured testimony and rejecting Plaintiff's testimony.

**Plaintiff's Trial**

64.     At Plaintiff's trial, Defendants Byrne, Dignan and Kelly were called by prosecuting attorneys to present testimony against Plaintiff.

65.     Prior to testifying at the trial, Defendants Byrne and Dignan falsely informed the prosecuting trial attorneys that they had not physically or psychologically coerced Plaintiff into giving a false confession, and they deliberately withheld the fact that they created Plaintiff's fabricated confession.

66.     Defendant Kelly did not inform the trial attorneys that he was aware that Plaintiff had been physically abused during his interrogation or that his confession was coerced and fabricated.

67.     Plaintiff's coerced and fabricated confession was presented as the chief piece of incriminating evidence against him at trial.  Without the individual Defendants' tortured and physically coercive interrogation, fabrication of confession, and their suppression of exculpatory evidence, Plaintiff would not have been prosecuted for, or convicted of, the murder, home invasion and robbery of James Fullilove.

68.     Plaintiff was convicted of murder, home invasion, and armed robbery of James Fullilove following a jury trial, and on July 12, 1984.   The trial judge sentenced Plaintiff to 40 years for murder and to 20 years each for home invasion and armed robbery, all sentences to be served concurrently.

69.     Thus, by their false reports, false information supplied to the prosecuting attorneys, and their perjured testimony at Plaintiff's motion to suppress and trial, Defendants

Byrne, Dignan and Kelly suppressed from the prosecutors who prosecuted Plaintiff, from the judges and juries who heard his case, and from the prosecutors and judges who prosecuted and heard Plaintiff's appeals and post-conviction proceedings, among other things, that the admissions they attributed to Plaintiff were: (a) false and unreliable; (b) the result of torture and physically coercion; and (c) constructed and fabricated by them.

70. Defendants Burge, Byrne, Dignan, and Kelly, together with their co-conspirators, also suppressed from the prosecutors who prosecuted Plaintiff, from the judges and juries who heard his case, and from the prosecutors and judges who prosecuted and heard Plaintiff's appeals, post-conviction petition, and motion to suppress, that the admissions they attributed to Plaintiff were a product of a pattern and practice of torture and abuse which they commanded, supervised and implemented; additionally they suppressed, committed perjury about, altered, and destroyed the physical implements of this pattern and practice of torture, including the rubber nightstick and plastic bag used against Plaintiff, his bloody clothes, as well as the cattle prods, electric shock box, plastic bags, typewriter covers, blackjacks, telephone books, shotguns, and handguns used by them against numerous other African Americans they tortured and physically abused.

**The Conspiratorial Pattern and Practice of Torturing and Abusing Suspects at Area 2 and Area 3 Police Headquarters and to Conceal and Cover Up the Torture and Abuse**

71. Plaintiff's torture and abuse was not an isolated incident of individual police officer brutality and misconduct. Rather, the interrogation and torture of Plaintiff in pursuit of a confession was part of a long-standing pattern and practice of similar acts of racially motivated torture, including electric shock, baggings, mock executions and Russian roulette, suspensions,

telephone bookings, and beatings, often with various kinds of objects including rubber nightsticks and hoses, committed, frequently with the use of racial epithets, against almost exclusively African American men under the supervision, and with the encouragement, participation and ratification of Defendants Burge and Byrne. Defendants Burge, Byrne, Dignan and Martin supervised, encouraged, participated in, failed to prevent, and/or ratified the abuse of Plaintiff, as alleged above, as part of this pattern and practice.

72. The earliest known cases of torture in this pattern occurred on or about August of 1972, when Defendant Burge, then a detective on the Area 2 midnight shift and his associates, brutally beat African American suspects Rodney Mastin, Lindsey Smith, and Phillip Moore, and in May of 1973 when Burge tortured Anthony Holmes, using an electric shock box, suffocation with a bag, beating and racial epithets.

73. The CPD took no action to punish or restrain defendant Burge at that time. Over the next decade, Burge and other Area 2 detectives tortured many African American suspects, including Lawrence Poree, Virgil Robinson, George Powell, Tony Thompson, Timothy Thompson, Willie Porch, Ollie Hammonds, Derrick King, Michael Coleman, Sylvester Green, and Melvin Jones.

**Richard M. Daley, Jane Byrne, Richard Brzeczek and Richard Devine**

74. In February 1982, the Superintendent of the CPD, Richard Brzeczek, and the Mayor of the City of Chicago, Jane Byrne, placed Defendant Burge in charge of a manhunt for the killers of two white Chicago Police officers. In the course of that manhunt, Burge and other Area 2 detectives tortured a number of African American citizens, including Donald White,

Anthony Williams, Lamont White, Walter White, Roy Brown, Walter Johnson, Paul Mike, Alphonso Pinex, Donnell Traylor, and Larry Milan, and abused and terrorized a large number of other African American civilians.

75.     In the early morning hours of February 14, 1982, Defendant Burge and numerous Area 2 detectives arrested Andrew Wilson for the police officer murders.  Throughout that day, Burge and other Area 2 detectives tortured Wilson, using the following techniques, among others: electric-shocking on the genitals, ears, and other parts of the body with a black box and a second plug in electrical device; suffocating with a plastic bag; burning on a radiator; and beating.  Defendant States Attorney Daley, the then Mayor of the City of Chicago Jane Byrne, and the then Superintendent of the Chicago Police Department Richard Brzeczek, all closely monitored developments in the manhunt.  All three learned from numerous sources about the widespread abuse during the manhunt, including the torture and abuse of Andrew Wilson and did nothing to prevent or stop that torture and abuse or to discipline, investigate, or otherwise bring to justice Burge and the other detectives who perpetrated it.

76.     As a direct and proximate result of the failure of Defendants Daley and Leroy Martin to intervene, to discipline and to adequately supervise, Defendants Burge, Byrne and other Area 2 and 3 Detectives tortured numerous additional almost exclusively African American suspects with electric shock, baggings, mock executions, and beatings, often while using racial epithets, in the period from February of 1982 to November of 1991.  The victims in this period, in addition to Plaintiff Smith, included the following men: Shadeed Mumin, Michael Johnson, Lee Holmes, Rodney Benson, Stanley Wrice, Bobby Joe Williams, Eric Smith, Franklin

16

Burchette, James Andrews, David Fauntleroy, Vincent Wade, Reginald Mahaffey, Jerry Mahaffey, Gregory Banks, David Bates, Darrell Cannon, Lee Norah, Leonard Hinton, Mearon Diggins, Leroy Orange, Leonard Kidd, L.C. Riley, Philip Adkins, Robert Billingsley, Stanley Howard, Dwight Cavin,  Alphonso Pinex, Thomas Craft, Lavert Jones, Alex Moore, Terry Harris, Lonza Holmes, Mearon Diggins, Michael Tillman, Stephen Bell, Eric Caine, Aaron Patterson, Andrew Maxwell, Gregory Howard, Darrell Cleveland, Terrence Houston, David Randle, Richard Terrell, Donald Torrence, Madison Hobley, Curtis Milsap, Ronald Kitchen, Marvin Reeves, Pedro Sepulveda, Maurice Deloney, Javon Deloney, James Marshall, Tony Anderson, Cortez Brown, Marcus Wiggins, Jesse Clemon, Imari Clemon, Damoni Clemon, Diyez Owens, Clinton Welton, Grayland Johnson, Enrique Valdez, Johnny Plummer, Tyshaun Ross, Keith Walker, Gerald Reed, Anthony Jakes, Travis Richardson, Michael Peterson and Ricardo Rodriguez.

### Defendant Daley's Failure to Intervene and Concealment of Exculpatory Evidence

77.     By no later than February 1982, Defendant Daley had direct, personal knowledge that Defendant Burge and other Area 2 detectives committed acts of torture against African American suspects at Area 2.  During the February 1982 manhunt described above, Defendant Daley closely monitored events, receiving regular reports from subordinates who, at various times, were at Area 2.  Daley therefore knew or should have known of the abuses of African American civilians that occurred in the course of the manhunt, including, in particular, the abuse of the White brothers and Anthony Williams, who were placed in protective custody by the Cook County State's Attorney's Office following acts of torture that Burge and his men perpetrated

against them.

78.     Defendant Daley was also informed of the arrests of Andrew and Jackie Wilson on the morning of February 14, 1982.  Throughout the day of February 14, as the Wilsons were tortured (frequently screaming in the course of the abuse), several high ranking Assistant State's Attorneys were present at Area 2.  An Assistant State's Attorney assigned as a supervisor to the Felony Review Unit, Larry Hyman, participated directly in the interrogation of the Wilsons, which occurred between sessions of torture at the hands of Burge and his men.  The high ranking members of the State's Attorney's Office present at Area 2 on February 14, 1982 knew or should have known that the Wilsons were being tortured.  Those high ranking assistants were reporting directly to Defendant Daley and to the First Assistant State's Attorney at the time, Richard Devine.  Neither Daley nor any of his top assistants did anything to halt or prevent the torture of the Wilsons.

79.     On or about February 17, 1982, Superintendent Brzeczek received a letter from Dr. John Raba, the Director of Medical Services at Cook County Jail, informing the Superintendent that a medical examination of Andrew Wilson revealed unmistakable evidence that Wilson had been brutalized while in police custody, and that Wilson reported being tortured with electric shock. In this letter, Dr. Raba demanded an investigation into Andrew Wilson's allegations.  After conferring with high ranking police command personnel, the Superintendent wrote a letter to Defendant Daley, enclosing the Raba letter and advising Daley that, in light of the pending prosecution of Wilson for the murder of the two white police officers, the Superintendent would not investigate or otherwise pursue the matter without instructions from

Daley.

80.     Defendant Daley received the Brzeczek letter (with its enclosure) and shared and discussed it with his First Assistant, Richard Devine, and other high level subordinates, including William Kunkle. Daley never responded to the letter.

81.     Defendant Daley and his subordinates were fully aware that Superintendent Brzeczek's letter set forth criminal conduct by Burge and other Chicago police detectives and officers, and they knew or should have known that ASA Larry Hyman might be complicit in this criminal conduct.  They also knew that there was physical, medical, and testimonial evidence which supported Andrew Wilson's claim of torture and physical abuse.  Not only did Daley fail to instruct the Superintendent of Police to conduct a criminal and/or administrative investigation, but he also failed to conduct a criminal investigation of his own, and did not refer the evidence to an independent agency for investigation. Instead, on information and belief, Daley communicated to Dr. Raba, through Cook County Board President George Dunne, that Raba "should not get involved" in the *Wilson* case, and subsequently, both Daley and Superintendent Brzeczek officially commended Burge and his men.

82.     As a direct result of Defendant Daley's refusal to act, the CPD, and its OPS indefinitely suspended all investigations into the allegations of torture and abuse made against Burge and his men, both by Wilson and Raba, and by African American civilians who were tortured and abused during the manhunt.

83.     Throughout the manhunt, the arrests first of the Whites then of the Wilson brothers, the receipt and discussions of the Brzeczek letter, and the decision not to contact

Brzeczek or to investigate, Defendant Daley and his subordinates, on information and belief, generated memoranda, notes, and other written communications documenting these events and decisions.

84.     This documentation, including the original copy of the Brzeczek letter, which contained a received stamp from Defendant Daley, no longer exists, and, on further information and belief, was destroyed by Daley.

85.     In the period of time between the Wilsons' torture, in February 1982, and when Defendant Daley left the Cook County State's Attorney's Office in December of 1988, Cook County prosecutors, under Daley's direction, prosecuted at least thirty African American men who were tortured by Defendants Burge, Byrne, Dignan, and other detectives under their command and supervision.  In none of these cases did Daley or his subordinates disclose specific exculpatory information within the possession of the office regarding the torture of Andrew Wilson and the specific knowledge of Daley and his high ranking subordinates as to the truth of Wilson's allegations.  In none of these cases, did Daley request or pursue an investigation into the allegations of torture.

86.     Defendant Daley had direct, personal knowledge of the claim of torture in a substantial number of the torture cases that the CCSAO prosecuted during this period of time, including in cases where Defendant Daley made the most grave and important decisions to seek the death penalty against numerous defendants who alleged they were tortured into confessing to crimes for which they stood accused.  Each and every such decision was made personally by the State's Attorney himself after careful review of the case and full consultation with both his high

command and the line assistants handling the prosecution.

87.     Subsequent to seeking and obtaining the death penalty in Andrew Wilson's case, Defendant Daley personally decided to seek the death penalty against Darrell Cannon, Leroy Orange, Leonard Kidd, Stanley Howard, Aaron Patterson, Reginald Mahaffey, Jerry Mahaffey, Michael Tillman, Steven Bell, Madison Hobley, and Ronald Kitchen—all of whom were tortured by Defendants Burge, Byrne, Dignan and/or detectives under their command and supervision. On information and belief, Daley's personal review of these cases revealed to him that each of these African American men claimed to have been tortured by Burge, Byrne, Dignan, and/or their men, in some cases using techniques identical or very similar to those Daley knew had been used against Andrew Wilson.  Knowing that these individuals all credibly claimed that they had been tortured into confessing, Daley nonetheless decided to seek the ultimate punishment against each of them, in each case declining to pursue any investigation of the involved Area 2 officers and deliberately failing to disclose the exculpatory information in his personal possession and in possession of the CCSAO.

88.     At the time Defendant Daley reviewed these cases and decided to seek the death penalty he (a) had near-certain personal knowledge that Andrew Wilson had been tortured and that numerous other African Americans had been tortured, abused, and terrorized by Burge and his men during the Wilson manhunt; (b) had personal knowledge that Burge and his Area 2 detectives were allegedly continuing to practice extreme physical abuse and torture against African American suspects; and (c) personally knew of exculpatory information regarding the pattern of torture, which he had deliberately suppressed since February 1982.  Daley nonetheless

decided to seek the ultimate punishment against these African American men without pursuing any investigation of their allegations and deliberately failing to disclose the exculpatory information in his personal possession and in possession of the Office of the Cook County State's Attorney.

89. The actions and inaction of Defendant Daley in refusing and failing to investigate the actions of Defendants Burge, Byrne, Dignan and their confederates and in suppressing the exculpatory evidence in his possession proximately caused Plaintiff's torture and his physical abuse, his wrongful prosecution, conviction and nearly two decades of wrongful incarceration for crimes that he did not commit.

**Defendant Martin's Failure to Intervene and Concealment of Exculpatory Evidence**

89. Defendant Martin was the Commander of Area 2 in 1983 and at that time was Defendant Burge's direct supervisor. At that time, Defendant Martin learned that Defendants Burge and Byrne, and detectives under their command, including Defendant Dignan, systematically tortured and abused numerous African American suspects, including Andrew and Jackie Wilson, Eric Smith, Plaintiff Alonzo Smith, James Andrews, Jerry Mahaffey, Reginald Mahaffey, Gregory Banks, David Bates, Darrell Cannon, James Cody and Leonard Hinton. Defendant Martin failed to initiate appropriate investigations or to discipline Burge in connection with any of these cases.

90. In 1987, Martin was named Superintendent of the CPD. As Superintendent, possessing direct knowledge of Burge's practices from his time as Area 2 commander, Defendant Martin continued to fail to intervene, to supervise, discipline or otherwise act to

22

prevent the ongoing misconduct of Burge and his men. Following Plaintiff's torture and

wrongful conviction, Defendant Martin worked actively to conceal and suppress evidence of the

pattern of torture, as is fully alleged below.

91.     The actions and inactions of Defendant Martin in refusing and failing to

investigate the actions of Defendants Burge, Byrne, Dignan, and their confederates and in

suppressing the exculpatory evidence in his possession proximately caused Plaintiff's torture and

his physical abuse, Plaintiff's wrongful conviction for crimes that he did not commit and

Plaintiff's wrongful incarceration.

### The Actions and Inactions of Defendants Daley, Martin, Hillard, Needham and Shines to Conceal and Cover-up the Pattern of Torture under Burge

92.     Following his conviction in 1984, Plaintiff languished in prison until 2002, when

he was released on parole. He continued to suffer under his wrongful conviction until his case

was dismissed by the Special Prosecutor (and retired Judge) Stuart Nudelman's Office in

October of 2015.

93.     Plaintiff's wrongful prosecution was continued, his exoneration was delayed and

his imprisonment and wrongful conviction lasted far longer than it otherwise would have

because, for many years, Defendants Daley, Martin, Hillard, Needham and Shines, in conspiracy

amongst themselves and with others, including Defendants Burge, Byrne, Dignan and, their

police confederates, and successive Police Superintendents and police command personnel,

continued to make extraordinary efforts to suppress, conceal and discredit exculpatory evidence

regarding the pattern of torture and physical abuse of African American men by Chicago Police

detectives under Burge's command.

23

94.     In 1989, Defendant Daley became the Mayor of the City of Chicago.  In that capacity he was directly responsible for the appointment of the Superintendent of the Chicago Police Department.  Defendant Daley also had ultimate responsibility for the operations of the Police.  Daley therefore had the duty to take all necessary steps to ensure that the Department and its officers disclosed exculpatory information to victims of Defendant Burge and his men, including Plaintiff.  In addition, Daley had an ongoing duty to disclose exculpatory information to Plaintiff and other Burge victims of which Daley had become personally aware while he was State's Attorney of Cook County.

95.     Defendant Daley while Mayor 1) did not disclose exculpatory information in his possession at any time from the date he resigned as State's Attorney of Cook County, until he left the Mayor's office in 2011; 2) did not intervene at any time to direct the CPD to disclose exculpatory information in its possession regarding Burge; and 3) did not direct the CPD to conduct a thorough and aggressive investigation of Defendants Burge, Byrne, Dignan, and the other detectives who tortured and abused African American men while working under Burge's command.

96.     Rather than disclose exculpatory material and conduct appropriate investigations, Defendants Daley, Martin, Hillard, Needham, Shines and other co-conspirators caused the CPD to actively conceal and suppress information regarding the scope and extent of the torture and abuse of African American suspects that occurred under Burge.  Their actions in this regard included, but are not limited to, those alleged above and below.

97.     In 1990 a report (hereinafter, the "Goldston Report") was prepared by OPS

24

investigator Michael Goldston, which found that there was systematic abuse of suspects held in custody at Area 2 and that Area 2 command personnel were aware of the systematic abuse and encouraged it by actively participating or failing to take action to stop it. In 1991, the Goldston Report was supplemented with a finding that Defendants Burge, Byrne, and Dignan were prime movers in this pattern of abuse and that Burge and two of his subordinates had tortured Andrew Wilson. In a companion Report (the Sanders Report) the OPS found that Burge, and these same two subordinates tortured Andrew Wilson and recommended that all three be fired.

98. The Goldston Report, and the information it contained, was highly exculpatory for Plaintiff, as he was tortured during the time period analyzed by the Goldston Report by officers cited in the Report as primary actors in the systematic torture.

99. Defendant Martin and other police command personnel delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, *inter alia*, by suppressing the findings that Wilson was tortured and by refusing to suspend, transfer or remove Burge either before, or for nearly a year after, the Goldston Report's findings were first made known to them in November of 1990.

100. Defendant Martin and other command personnel further delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, *inter alia*, by suppressing the findings that there was systematic abuse at Area 2, which implicated Defendants Martin, Burge, Byrne, Dignan, and other Area 2 detectives who worked under Burge's command.

101. The Goldston Report and its findings were not publicly released until February 7,

1992, when Federal District Judge Milton I. Shadur ordered the Report's release.

102.    On or before February 7, 1992, Defendant Daley was specifically informed or was otherwise aware of the Goldston Report findings of "systematic" Area 2 torture that was "condoned and participated in" by Area 2 command personnel.  Defendant Daley knew or should have known that Defendant Martin had been the commanding officer at Area 2 and Defendant Burge's direct supervisor during part of the time the Goldston Report found there to be "systematic" torture, and that Defendant Martin therefore had a motive and the intent to suppress and discredit the Goldston Report and its findings.

103.    Despite this and all that he previously knew about torture by Burge and his men, and despite the findings of the Goldston Report itself, Defendant Daley did not 1) seek an independent federal investigation; 2) direct Defendant Martin to initiate a criminal investigation or to open disciplinary proceedings against the Area 2 detectives, supervisors and command officers identified in the Goldston Report; or 3) seek the prosecution of Burge and his confederates.

104.    Instead, in a joint effort with Defendant Martin, Defendant Daley sought to publicly discredit the Goldston Report and defend Martin's prior suppression of it, saying "these are only allegations . . . rumors, stories, things like that." The intent and effect of these statements was, *inter alia*, to undermine the accuracy and validity of the Goldston Report's finding that the torture at Area 2 was "systematic" and participated in by command personnel.

105.    Even after learning of the findings in the Goldston Report, Defendant Martin, Defendant Shines, and other command personnel, in violation of police regulations, refused to

investigate numerous other allegations of police torture that were brought to their attention, including allegations of electric shock and abuse previously made by electric shock victim Melvin Jones against Defendant Burge.

106.     From 1989 to 1992, Defendants Daley and Martin, and their command subordinates, through several public hearings held by the Chicago City Council and the Chicago Police Board, and a report by Amnesty International, were given additional actual notice that Defendant Burge was the leader of a group of Chicago detectives that systematically tortured and abused African American suspects in order to obtain confessions in murder and other serious felony cases.

107.     In January of 1992, Defendant Martin admitted in a publicly filed pleading that an "astounding pattern or plan" on the part of Burge and his confederates "to torture certain suspects, often with substantial criminal records, into confessing to crimes."

108.     In February 1993, the Chicago Police Board fired Defendant Burge for torturing Andrew Wilson.  These findings became final in December 1995.

109.     In 1993 the OPS re-opened investigations into approximately ten Area 2 torture cases.  After an exhaustive re-investigation, which uncovered substantial new evidence in support of the allegations, OPS investigator Veronica Tillman-Messenger sustained numerous allegations that Defendants Byrne and Dignan racially abused and tortured Darrell Cannon with a cattle prod.  OPS supervisor Carmen Christia reviewed the findings and approved them.

110.     The OPS also entered sustained findings of torture and abuse against Byrne and/or Dignan in five other re-opened cases: Phillip Adkins, Gregory Banks, Thomas Craft, Lee Holmes

27

and Stanley Howard.

111.    From 1993 until 1998, Defendant Shines (who had previously been appointed by Defendant Daley), under pressure from her fellow Defendants and co-conspirators, suppressed these findings and the evidence which supported them by secreting the files in her personal office.

112.    In 1996, Defendant Daley, despite numerous allegations and sustained findings of torture and abuse against Defendant Dignan, meritoriously promoted him to the police rank of lieutenant.

113.    In 1998, Defendants Hillard and Needham, with full knowledge that Defendants Burge, Byrne, Dignan, and other Area 2 and Area 3 detectives participated in a pattern and practice of torture and abuse of suspects, including Plaintiff, violated police regulations and obstructed justice by overturning the OPS sustained findings in the six re-opened cases set forth above; by refusing to investigate other torture victims' claims that they had been tortured; by refusing to investigate Defendant Shines' suppression of evidence; and by suppressing these OPS files and findings from Plaintiff and other criminal defendants.

114.    On information and belief, Defendant Daley also personally insisted, from the time he became Mayor in 1989 until he was succeeded in 2011, that the City of Chicago continue to finance the defense of Defendants Burge, Byrne, Dignan and their accused colleagues and subordinates, despite his personal knowledge that Burge committed acts of torture against African American men while employed as a Chicago Police officer and supervised and condoned such acts by supervisors and detectives under his command.  Daley's insistence on defending

Burge was contrary to the recommendation of Daley's senior staff that the City sue rather than defend Burge, and continued throughout Daley's tenure as Mayor, despite Burge's indictment in October of 2008 for perjury and obstruction of justice, and his conviction on these charges on June 28, 2010.

**Plaintiff's Exoneration**

115.    The concealment, obstruction and suppression of exculpatory information and continuing failure to investigate or discipline described above materially and significantly continued the wrongful prosecution of Plaintiff, substantially delayed Plaintiff's exoneration, and caused Plaintiff to face many additional years of unjust incarceration that he would not have endured if the obstruction, suppression and concealment had not occurred.

116.    Pursuant to Plaintiff's Post-Conviction Petition, and after a full evidentiary hearing, Circuit Court Judge Erica Reddick found that Plaintiff had been tortured and physically abused to give a confession and vacated his conviction, and granted him a new trial.

117.    On October 19, 2015, the prosecution dismissed all charges against Plaintiff, thereby terminating the criminal proceedings in his favor.

**The Defendants' Misconduct Was Committed in Furtherance of a Conspiracy**

118.    All of the named individual Defendants, acting jointly and with other police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged in an ongoing course of conduct and joint action and otherwise conspired and continue to conspire among and between themselves to deprive Plaintiff of his constitutional rights.  This conspiracy is evidenced, *inter alia*, by the overt acts set forth above

29

and below, and has continued to the present, as evidenced, *inter alia*, by the false testimony and statements denying torture given in the years 2003 to the present by these Defendants and their fellow officers; false statements and testimony that Burge, co-conspirator and former Area 2 detective Michael McDermott, and various other police and assistant state's attorney co-conspirators gave to the FBI, before the Federal Grand Jury, and/or at trial in *U.S. v Burge*; and by false public statements concerning police torture made by, *inter alia*, Defendants Daley, Burge, and Byrne and co-conspirator Richard Devine, including those made in July of 2006 in response to the Special Prosecutor's Report, in October of 2008 in response to Burge's indictment, in June and July of 2010 in response to Burge's conviction, and in April and May of 2015 in response to Chicago City Council passing of the Reparations For Burge Torture Victims' Ordinance. By and through these overt acts, together with those set forth above, each and every Defendant, jointly and in conspiracy, with a shared understanding, intent, and/or meeting of the minds, deprived, and continues to deprive, Plaintiff of his constitutional rights, including his right to be free from unreasonable arrest, seizure, wrongful confinement and imprisonment and the excessive use of force; his right to be free from involuntary self-incrimination and from interrogation techniques that "shock the conscience;" his right to access to the courts and to a fair and impartial trial; and his right to equal protection of the law, all as protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Plaintiff's Damages**

119.     Plaintiff spent nearly 20 years in prison for a crime he did not commit.  This time was emotionally, physically, and psychologically dehumanizing and debilitating, and Plaintiff

has suffered from constant fear and anxiety, deep depression, despair, rage, boredom and loneliness. Plaintiff also suffered from the loss of sustained contact with his wife, mother, children and other members of his family, and was prevented from holding gainful employment or pursuing educational opportunities outside the prison walls. He continues to live under the effects of his isolation, incarceration, and depression, and, until his exoneration, under the stigma of his wrongful conviction. Additionally, Plaintiff suffered, and continues to suffer, egregious pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and severe mental distress and anxiety from his torture and abuse.

## COUNT I
### (42 U.S.C. 1983 Claim for Deprivation of Fair Trial and for Wrongful Conviction)

120. Plaintiff re-alleges paragraphs 1 through 119.

121. Defendants Daley, Burge, Byrne, Dignan, Kelly and Martin, individually, jointly, and in conspiracy, caused the wrongful charging, prosecution, conviction, and imprisonment of Plaintiff. Additionally, these same Defendants, together with Defendants Shines, Hillard, and Needham, individually, jointly, and in conspiracy, caused the continuation of that wrongful conviction.

122. These Defendants caused and/or continued Plaintiff's wrongful charging, prosecution, conviction and imprisonment by committing or causing to be committed one or more of the following acts: physically and mentally coercing, constructing and fabricating the false and totally unreliable confession which formed the basis for Plaintiff's charging, prosecution and conviction; by withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that this confession was false, totally unreliable,

31

constructed and physically and mentally coerced; by suppressing, destroying and preventing the discovery and development of additional exculpatory torture findings and evidence, including, but not limited to, the instruments of torture as well as other exculpatory evidence; by giving a false and incomplete version of events to prosecutors; by writing false reports and giving false testimony; by improperly influencing the judges hearing Plaintiff's case, *inter alia*, by making false public statements; by obstructing and improperly influencing investigations which would have led to discovery of further exculpatory evidence; by suppressing and attempting to discredit findings of individual and systematic torture and abuse; and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the United States Constitution.

123.   Additionally and/or alternatively, the Defendants named above failed to intervene to stop Plaintiff's wrongful prosecution and conviction and resultant imprisonment despite having the opportunity and duty to do so.

124.   The actions of Defendants Daley, Burge, Byrne, Dignan, Kelly, Martin, Shines, Hillard, and Needham in depriving Plaintiff of his right to a fair trial and not to be wrongfully convicted and imprisoned, and, additionally and/or alternatively, in failing to intervene to stop said violations, were the direct and proximate cause of the injuries to Plaintiff which are set forth above.

125. Additionally and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Dignan, Kelly, the Estate of Martin, Shines, Hillard, and Needham, for substantial compensatory damages, and, additionally, for substantial punitive damages against Defendants Daley, Burge, Byrne, Dignan, the Estate of Martin, Shines, Hillard, and Needham, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT II
### (42 U.S.C. § 1983 Claim for Coercive Interrogation)

126.    Plaintiff re-alleges paragraphs 1 through 125.

127.    The actions of Defendants Burge, Byrne, Dignan, and Kelly individually, jointly, and in conspiracy, in coercively interrogating Plaintiff, and of Burge, Byrne and Dignan, in using torture techniques which "shock the conscience" during said interrogations, resulted in the false, coerced, and fabricated confession that was subsequently used against him in his criminal proceedings, and thereby violated Plaintiff's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law of the as guaranteed by the United States Constitution.

128.     The actions of Defendants Burge, Byrne, and Dignan, in using torture and other coercive techniques to interrogate Plaintiff, and/or, together with Defendant Kelly, in encouraging, condoning and permitting the use of said techniques, and/or failing to intervene to stop the coercive interrogation of Plaintiff, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

129.    Additionally, Defendants Daley and Martin had repeatedly failed to intervene to stop and prevent Defendants Burge, Byrne, Dignan, and their co-conspirators from continuing

their coercive interrogations and torture tactics, *inter alia*, by exposing rather than covering-up said conduct, and by investigating, removing or otherwise disciplining them when they first learned of their criminal conduct in 1982, and on numerous occasions subsequent thereto, despite having the opportunity and duty to do so, thereby constituting a failure to intervene and prevent Plaintiff's brutal and torturously coercive interrogation.

130.    The failure of Defendants Daley, Martin and their co-Defendants to intervene to stop Defendants Burge, Byrne, and Dignan, and their co-conspirators from continuing their coercive interrogations and torture tactics proximately caused Plaintiff's coercive interrogation by torture and his resultant injuries and damages as more fully set forth above.

131. Additionally and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Dignan, Kelly, and the Estate of Martin for substantial compensatory damages, and, additionally, for substantial punitive damages against Defendants Daley, Burge, Byrne, Dignan, and the Estate of Martin, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT III
### (42 U.S.C. §§ 1985, 1986 Claim for Conspiracy)

132.    Plaintiff re-alleges paragraphs 1 through 131.

133.    Defendants Daley, Burge, Byrne, Dignan, Kelly, Martin, Shines, Needham, and Hillard, together with the named and other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an

understanding, engaged and continue to engage in a course of conduct, and otherwise jointly

acted and/or conspired among and between themselves to commit the unconstitutional overt acts

set forth in the facts above.

134.    Because said conspiracy or conspiracies and the overt actions in furtherance

thereof were done and continue to be done with the knowledge and purpose of depriving

Plaintiff, who is African American, and numerous other African American torture victims of the

equal protection of the laws and/or of equal privileges and immunities under the law, and with

racial animus toward the Plaintiff and the other victims of this racially motivated conspiracy, the

Defendants also deprived Plaintiff of his right to equal protection of the laws under the

Fourteenth Amendment of the United States Constitution, and 42 U.S.C. § 1985.

135.    Additionally or alternatively, Defendants Burge, Byrne, Dignan, and Kelly,

knowing that the above §1985 conspiracy to torture and wrongfully convict Plaintiff was about

to be committed, and having the power to prevent or aid in preventing the commission of the acts

in furtherance of said conspiracy, neglected and/or refused so to do, in violation of 42

U.S.C.§1986.

136. Additionally and alternatively, these actions were taken maliciously, willfully,

wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally from

Defendants Daley, Burge, Byrne, Dignan, Kelly, the Estate of Martin, Shines, Needham, and

Hillard and, additionally, for punitive damages against Defendants Daley, Burge, Byrne,

Dignan, the Estate of Martin, Shines, Needham, and Hillard, plus attorneys' fees, the costs of this

action and whatever additional relief this Court deems equitable and just,

## COUNT IV
### (42 U.S.C. § 1983 *Monell* Policy Claim Against the City of Chicago)

137.     Plaintiff re-alleges paragraphs 1 through 136.

138.     The actions of Defendants Daley, Burge, Byrne, Dignan, Martin, Shines, Hillard, and Needham, as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago.

139.     At all times material to this complaint, the Defendant City of Chicago through its Police Department, Police Superintendents, Police Board, Mayors, City Council and/or Corporation Counsel's Office, had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

  a.     conducting physically, psychologically or otherwise illegal or improperly coercive interrogations of witnesses, suspects and arrestees in order to obtain confessions and wrongful convictions, including with the use of torture techniques under the command and supervision of Defendants Martin, Burge and Byrne at Area 2, and later at Area 3;

  b.     manufacturing, fabricating, and/or using improper suggestive tactics to obtain false witness statements and identifications;

  c.     the filing of false reports, and giving false statements and testimony about said interrogations and confessions and fabricating or constructing parts or all of said confessions, suppressing evidence concerning said interrogations and confessions, pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions obtained during said interrogations, denying suspects their right to full and fair access to the courts, and otherwise covering up the true nature of said interrogations and confessions, particularly in circumstances where torture techniques were used by Area 2 and Area 3 detectives under the command and supervision, and with the active participation of, Defendants Burge and Byrne;

  d.     the failure to video and/or audio tape the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in a-b above;

e.      the failure to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of torture and related abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or improperly coercively questioning or interrogating witnesses, suspects and arrestees, particularly persons who were tortured and or physically and/or psychologically abused during questioning. This failure to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control includes the "repeater" Defendants Burge, Byrne, and Dignan, as well as all the other Area 2 and 3 detectives who were repeatedly accused of torturing and physically abusing suspects;

f.      the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above (i.e., police torture and other unconstitutional and coercive interrogations at Area 2 and Area 3 under the command and supervision of Defendants Burge and Byrne) whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report. Said code of silence also includes police officers either remaining silent or giving false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves and/or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal cases where they and/or their fellow officers have tortured or coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant, particularly in cases where torture techniques under the command and supervision of Defendants Burge and Byrne at Area 2, and later at Area 3, were employed. An egregious example of this code of silence in the torture cases is evidenced and invoked in response to the Government's investigation and prosecution of Burge and the investigation of Defendants Byrne, Dignan, and other officers under their command and supervision;

g.      covering up and suppressing evidence and findings; refusing to properly investigate, arrest and charge, continuing to finance the defense of Defendants Burge, Byrne, Dignan, and other Area 2 and 3 detectives who have been sued for their misconduct, and otherwise attempting to both publicly and judicially defend these officers' actions long after repeatedly acknowledging that Burge had committed repeated acts of torture, and after he had been indicted and convicted for lying about these acts; and otherwise obstructing justice in police torture cases, particularly those that arose at Area 2 and Area 3 under the supervision, and with the participation of, Burge and Byrne.

140.    The pattern and practice of torture and abuse at Area 2 and Area 3, the cover-up of that abuse and the wrongful prosecutions and convictions which resulted therefrom, were well known within Area 2 and Area 3 both well before and after Plaintiff was tortured and wrongfully convicted, including by the command officers at Area 2, which included Defendants Burge and Martin, and Burge's successor, Phil Cline, as well as to former Chicago Mayor Jane Byrne and to Defendant Daley (both before and throughout his tenure as Mayor of Chicago) and their Chiefs of Staff, successive Police Superintendents, (including Richard Brzeczek, Fred Rice, Defendant Martin, Matt Rodriguez, Defendant Hillard, and Cline), to the successive OPS Directors, including Defendant Shines, and Callie Baird, various Command Personnel, including Deputy Superintendents McCarthy, Lyons, Hoke and Townsend, the Chiefs of Detectives, including William Hanhardt and Hillard, to the Chicago City Council and the Chicago Police Board, and to other policy making, command, and supervisory City and police personnel, who participated in the cover-up and suppression of evidence, the wrongful prosecution and conviction of the Plaintiff and other torture victims, and the denial of their full and fair access to the courts, *inter alia*, in the manner set forth in this complaint.

141.    Said interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; they encouraged, *inter alia*, the coercing of statements from suspects, witnesses and arrestees, by torture and related abusive tactics and techniques, the construction and fabrication of confessions, admissions, statements, identifications, and other false witness evidence, the suppression and destruction of evidence of torture and other exculpatory evidence, the

intimidation of witnesses, the making of false statements and reports, the giving of false testimony, the obstruction of justice, the manipulation and obstruction of the State and Federal courts, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a moving force behind, and a direct and proximate cause of, the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators, and the injuries suffered by the Plaintiff.

142.    Additionally, the City of Chicago's said failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel Defendants Burge, Byrne, and Dignan, who were involved in numerous other acts of torture and abuse, as well as Defendants Martin, Shines, Hillard, and Needham, was also done with deliberate indifference and likewise acted as a direct and proximate cause of the injuries to Plaintiff.

143.    Additionally, and/or alternatively, the involvement in, and ratification of, the unconstitutional actions set forth above, by Chicago governmental and police policymakers, including, but not limited to, successive Police Superintendents, including Defendants Martin and Hillard, and their direct subordinates, including, but not limited to, Defendants Shines and Needham, and several Mayors, most notably Defendant Mayor Richard M. Daley, who continued to publicly both ratify and deny his involvement in said conduct until he left office in 2011, establish that said constitutional violations were directly and proximately caused by the City of Chicago and its Police Department.

WHEREFORE, Plaintiff demands judgment against Defendant City of Chicago for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief

this Court finds equitable and just.

## COUNT V
### (State Law Claim for Malicious Prosecution)

144.     Plaintiff re-alleges paragraphs 1 through 143.

145.   Defendants Burge, Byrne, Dignan, and Kelly individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Plaintiff, and these same Defendants, together with Defendants Daley, Martin, Shines, Hillard, and Needham, individually, jointly, and in conspiracy, continued said prosecution, again without probable cause. Said prosecution was ultimately terminated in Plaintiff's favor.   The Defendants' actions were done in a willful and wanton manner, and directly and proximately caused the injury and damage to Plaintiff set forth above.

WHEREFORE, Plaintiff demands actual or compensatory damages against Defendants Daley, Burge, Byrne, Dignan, Estate of Martin, Kelly, Shines, Hillard, and Needham, and, additionally, punitive damages against Defendants Daley, Burge, Byrne, Dignan, Estate of Martin, Shines, Hillard, and Needham, the costs of this action, and such other and additional relief as this Court deems equitable and just.

## COUNT VI
### (State Law Claim for Intentional Infliction of Emotional Distress)

146.     Plaintiff re-alleges paragraphs 1 through 145.

147.     Defendants Daley, Burge, Byrne, Dignan, Kelly, and Martin individually, jointly, and in conspiracy, by, *inter alia*, torturing a false confession from Plaintiff and/or by failing to prevent or stop said torture, by constructing and fabricating the confession, and by procuring his

prosecution, conviction, and imprisonment for a murder and other crimes he did not commit by means of said false confession, engaged in extreme and outrageous conduct. Additionally these same Defendants, together with Defendants Hillard, Shines, and Needham, individually, jointly, and in conspiracy, *inter alia*, by fabricating, coercing, and suppressing other evidence, by continuing Plaintiff's false imprisonment after procuring his wrongful conviction, by refusing to investigate or discipline the torturers, and by making false public statements, engaged in additional extreme and outrageous conduct.

148.     Defendants Daley, Burge, Byrne, Dignan, Kelly, Martin, Shines, Needham, and Hillard intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.

149.     As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was, and continues to be, injured, and has, and continues to, experience severe emotional distress, including nightmares, sleep disruption, anxiety, depression, inability to focus or concentrate, and a recurring fear of re-arrest, torture, and re-prosecution.

WHEREFORE, Plaintiff demands judgment against Defendants Daley, Burge, Byrne, Dignan, Kelly, Estate of Martin, Shines, Needham, and Hillard, for compensatory damages, plus the costs of this action, and such other relief as this Court deems equitable and just.

## COUNT VII
### (State Claim for Conspiracy)

150.     Plaintiff re-alleges paragraphs 1 through 149.

151.     Defendants Daley, Burge, Byrne, Dignan, Kelly, Martin, Shines, Needham, and

41

Hillard, with the named and other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to maliciously prosecute and/or continue said prosecution, and to intentionally inflict continuing severe emotional distress on Plaintiff.

152. In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in the facts above.

153. Said conspirac(ies) and overt acts were and are continuing in nature.

154. Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally from Defendants Daley, Burge, Byrne, Dignan, Kelly, Estate of Martin, Shines, Needham, and Hillard, and, additionally,  because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages against Defendants Daley, Burge, Byrne, Dignan, Estate of Martin, Shines, Needham, and Hillard,, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT VIII
### (State Law *Respondeat Superior* Claim)

155. Plaintiff re-alleges paragraphs 1-125 and 145-54.

156. Defendants Burge, Byrne, Dignan, Martin, Shines, Needham, and Hillard were, at certain times material to this complaint, employees of the Defendant City of Chicago, were

acting within the scope of their employment, and their acts which violated state law are directly chargeable to the Defendant City under state law pursuant to *respondeat superior*.

157.    Defendant Daley, at certain times specified in the complaint, (from 1989 to 2011) was an employee of the Defendant City of Chicago, was acting at these times within the scope of his employment as a City employee, and those acts which are actionable under state law are directly chargeable to the Defendant City under state law pursuant to *respondeat superior*.

WHEREFORE, Plaintiff demands judgment against the City of Chicago for any and all compensatory damages awarded on Plaintiff's state law claims against the Defendants named in this Count, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT IX
### (745 ILCS 10/9-102 and Common Law Claims Against the City and County)

158.    Plaintiff re-alleges paragraphs 1 through 157.

159.    Defendant City of Chicago was the employer of Defendants Burge, Byrne, Dignan, Martin, Shines, Needham, and Hillard at certain times relevant and material to this complaint.

160.    These Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Chicago.

161.    Additionally, Defendant City of Chicago was the employer of Defendant Daley at the times so specified in this complaint (1989-2011); Daley committed the acts which he committed during his employment with the City in the scope of his employment as an employee of the City of Chicago.

43

162.    Defendant Cook County was at certain times material to this complaint the employer of Defendant Kelly; additionally it was the employer of Defendant Daley while he was State's Attorney of Cook County (from 1980 through 1988).  Said County is therefore responsible for any judgment entered against Defendant Kelly and for any judgment entered against Defendant Daley for acts committed by him during said employment with the County, making the County a necessary party to this complaint.  Defendants Kelly and Daley committed the acts alleged above under color of law and, when so employed, in the scope of their employment as employees of Cook County and its State's Attorneys' Office.

WHEREFORE, Plaintiff, pursuant to 745 ILCS § 10/9-102, and otherwise pursuant to law, demands judgment against the Defendants City of Chicago, and Cook County in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.


Dated: March 17, 2016                        Respectfully submitted,


                                             /s/ Joey L. Mogul/ G. Flint Taylor

                                             Joey L. Mogul, G. Flint Taylor
                                             People's Law Office
                                             1180 N. Milwaukee Avenue
                                             Chicago, IL 60642
                                             (773) 235-0070

                                             Attorneys for Plaintiff Alonzo Smith

                                             **Plaintiff demands trial by jury on all counts**.

44