**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ALONZO SMITH,            )
                             )
           Plaintiff,      )
                             )    Case No. 16 C 3404
       v.              )
                             )
JON BURGE, et al.,     )
                             )
          Defendants.   )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On March 17, 2016, Plaintiff Alonzo Smith brought the present nine-count Complaint against former Chicago Police Officers, former Cook County State's Attorneys, former City of Chicago officials, the City of Chicago, and the County of Cook[1] alleging violations of his constitutional rights, along with supplemental state law claims. *See* 28 U.S.C. §§ 1331, 1367(a). Before the Court are the Chicago Defendants' motion to dismiss, Defendants Paul Kelly's and Cook County's motion to dismiss, and Defendant Richard M. Daley's motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court denies the Chicago Defendants' motion to dismiss, denies Defendants Kelly's and Cook County's motion to dismiss, and grants in part and denies in part Defendant Daley's motion to dismiss.

---

[1] The parties do not dispute that Cook County is a necessary party to this lawsuit for indemnification purposes under 745 ILCS 10/9-102.

# LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.,* 761 F.3d 732, 736 (7th Cir. 2014). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under the federal pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570).

When determining the sufficiency of a complaint under the plausibility standard, courts must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016). Also, it is well-settled that "a plaintiff ordinarily need not anticipate and attempt to plead around affirmative defenses." *Hyson USA, Inc. v. Hyson 2U, Ltd.,* 821 F.3d 935, 939 (7th Cir. 2016). Nevertheless, a "statute of limitations defense is properly considered in determining a Rule 12(b)(6) motion when the factual allegations in the complaint establish such a defense." *Bonnstetter v. City of Chicago,* 811 F.3d 969, 974 (7th Cir. 2016).

# BACKGROUND

## I. Introduction

Plaintiff alleges that he spent approximately twenty years incarcerated in the Illinois Department of Corrections due to his wrongful conviction of home invasion, armed robbery, and murder of James Fullilove in 1984. (R. 1, Compl. ¶¶ 1, 68.) Plaintiff brings the present civil rights lawsuit after a Circuit Court of Cook County judge vacated his convictions pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, after which the State dismissed all charges against him on October 19, 2015. (*Id*. ¶¶ 92, 116, 117.)

Plaintiff alleges that Defendant Sergeant John Byrne and Defendant Detective Peter Dignan – at the direction of Defendant Chicago Police Commander Jon Burge – falsely arrested and charged him with Fullilove's murder after Defendants Byrne and Dignan tortured him to coerce his confession. (*Id.* ¶ 1.) Plaintiff asserts that his case was not an isolated occurrence, but rather the interrogation and torture at the Area 2 Police Headquarters ("Area 2") was part of a long-standing pattern and practice of racially motivated torture, including electric shock, baggings, mock executions, Russian roulette, and beatings dating back to the early 1970s when Defendant Burge was a detective at Area 2 on the midnight shift. (*Id*. ¶¶ 71, 72.) Also, Plaintiff alleges that personnel in the Chicago Police Department ("CPD"), several Chicago mayors, successive Superintendents of the Chicago Police, and certain Cook County State's Attorneys concealed their knowledge of this ongoing, systemic torture and abuse. (*Id*. ¶ 2.)

## II. Parties

Defendants in this lawsuit include John Byrne, who was a duly appointed and sworn Chicago Police Sergeant in Area 2 from 1982 to August 1986, and supervisor of Area 2's

midnight shift under Defendant Burge's command. (*Id.* ¶ 8.) From 1988 to 1991, Defendant

Byrne was a Sergeant in the Violent Crimes Unit of Area 3 ("Area 3"), which was also under

Defendant Burge's command. (*Id.*) Defendant Peter Dignan was a duly appointed and sworn

Chicago Police Detective assigned to Area 2 under Defendant Burge's command. (*Id.* ¶ 9.)

From 1987 to 1992, Defendant Leroy Martin was Chicago's Superintendent of Police and was

Defendant Burge's direct supervisor at Area 2 in 1983 and early 1984. (*Id.* ¶ 10.) Defendant

Terry Hillard was Chicago's Superintendent of Police from 1998 until 2004. (*Id.* ¶ 11.) From

1998 to 2002, Defendant Thomas Needham was counsel to and chief administrator for Defendant

Hillard. (*Id.* ¶ 12.) From 1981 to 1989, Defendant Daley was the State's Attorney of Cook

County, and from 1989 until 2011, Defendant Daley was Chicago's Mayor. (*Id.* ¶ 13.)

Defendant Gayle Shines was the Director of the now defunct Office of Professional Standards

("OPS")[2] from 1990 to 1998. (*Id.* ¶ 14.) Defendant Paul Kelly was an Assistant Cook County

State's Attorney assigned to the Felony Review Unit during the relevant time period. (*Id.* ¶ 15.)

## III.    Plaintiff's Arrest and Interrogation

On January 18 or 19, 1983, Fullilove was found dead in his apartment in Chicago. (*Id.* ¶

19.) Detectives from Area 2, including Defendants Byrne and Dignan, were responsible for

investigating Fullilove's death, and Defendant Burge was the CPD Lieutenant leading the

Fullilove investigation. (*Id.* ¶¶ 20, 21.) On January 21, 1983, around noon, Plaintiff voluntarily

---

[2] Before September 2007, the Chicago Police Department's Office of Professional Standards ("OPS") had the responsibility for investigating misconduct complaints against Chicago police officers. In September 2007, the City removed OPS from the Chicago Police Department and reorganized it as a separate department – the Independent Police Review Authority ("IPRA") – which reports directly to the Mayor of the City of Chicago.

went to Area 2 Police Headquarters with a friend after he learned that CPD officers visited his house asking to speak with him about the Fullilove murder. (*Id.* ¶ 22.) Area 2 detectives interrogated Plaintiff for two hours, after which the officers contacted Defendants Byrne and Dignan and informed them of the status of the investigation. (*Id.* ¶ 23.) Defendants Byrne and Dignan then arrived at Area 2. (*Id.*) Also, Defendant Burge talked to Plaintiff on two separate occasions at Area 2 on January 21, 1983, and after Plaintiff denied involvement in the crime, Defendant Burge told Plaintiff that he would talk one way or another before the night was over because they had ways of making him talk. (*Id.* ¶ 24.)

Plaintiff alleges that Defendant Dignan then confronted him in an interrogation room on the second floor of Area 2, told him to get up, and said "we're going to have a real conversation now." (*Id.* ¶ 25.) Defendants Dignan and Byrne proceeded to take Plaintiff downstairs to the basement of Area 2. (*Id.* ¶ 26.) Plaintiff asserts that Defendant Byrne asked Defendant Dignan if he had "the stuff," and Defendant Dignan replied that he did, but that some of it was in the car. (*Id.* ¶ 27.) Next, Defendant Dignan left the Area 2 police station and returned with a plastic bag that looked like a garbage bag. (*Id.*) Upon return, Defendant Dignan unlocked the door to the basement and both he and Defendant Byrne took Plaintiff there. (*Id.* ¶ 28.)

Once in the basement, Defendants Byrne and Dignan forced Plaintiff to sit in a metal swivel chair and handcuffed his hands behind his back. (*Id.* ¶ 29.) According to Plaintiff, Defendant Dignan then opened the plastic bag and brandished a black rubber nightstick that was about 16-18 inches in length. (*Id.* ¶ 30.) Subsequently, Defendant Dignan asked Plaintiff if he knew CPD officer Allen Davis – who was also in custody and later became Plaintiff's co-defendant in the Fullilove crimes – and Plaintiff responded "no." (*Id.*) Defendant Dignan then

told Plaintiff that he was lying, that he had been lying all day, and that he wanted Plaintiff to tell the truth.  (*Id.* ¶ 31.)  Plaintiff reiterated to Defendant Officers that he was telling the truth.  (*Id.*)  Plaintiff asserts that Defendant Dignan responded by saying that "he had all night" and that before Plaintiff "left the basement" he would "tell them what they wanted to hear."  (*Id.* ¶ 32.)  Defendant Dignan then told Plaintiff that he would give him one more chance to tell "the truth," and Plaintiff responded that he had been doing so.  (*Id.* ¶ 33.)  In response, Defendant Dignan hit Plaintiff several times between the legs with the rubber nightstick while Plaintiff was seated and handcuffed, and Defendant Byrne kicked Plaintiff in the stomach.  (*Id.* ¶ 34.)  In addition, both Defendants Dignan and Byrne hit Plaintiff with their nightsticks on the palms of Plaintiff's hands and the back of his legs.  (*Id.*)

Thereafter, Defendants Byrne and Dignan pulled the plastic bag over Plaintiff's head, put a thick brown rubber band around the bag, and told Plaintiff that they were going to show him how to suffocate a dope dealer.  (*Id.* ¶ 35.)  While Plaintiff had the bag over his head, Defendant Byrne kicked him in the stomach, and Defendant Dignan hit him in the stomach with his nightstick.  (*Id.* ¶ 36.)  The next thing Plaintiff remembered was getting up off the floor with the bag removed from his head.  (*Id.* ¶ 37.)  Plaintiff alleges that Defendants Dignan and Byrne then picked him up, put him back on the chair, told him that was "round one," and reminded him that they had all night.  (*Id.* ¶ 38.)  Defendant Detectives also told Plaintiff to go ahead and scream because no one could hear him.  (*Id.*)  Further, Plaintiff states that Defendants Dignan and Byrne asked him about Officer Davis and whether they committed the Fullilove murder together.  (*Id.* ¶ 39.)  When Plaintiff responded that he did not kill Fullilove, Defendant Officers Dignan and Byrne bagged and beat him again.  (*Id.*)  After that, Plaintiff can only remember getting off the

floor with his lip bleeding and blood on his clothes.  (*Id.* ¶ 40.)

Again, Defendants Dignan and Byrne put Plaintiff in the chair and resumed interrogating him.  (*Id.* ¶ 41.)  At that point, Plaintiff saw Defendants Dignan and Byrne preparing to bag and beat him again, after which he told them he had had enough of the beatings.  (*Id.* ¶ 42.)  Plaintiff alleges that Defendants Byrne and Dignan told him to "tell the truth," instructed him on exactly what to say, and then made Plaintiff repeat the story back to them.  (*Id.* ¶¶ 43, 44.)  Plaintiff explains that he did this because he thought that if he told Defendants Dignan and Byrne what they wanted to hear, they would stop torturing him.  (*Id.*)  According to Plaintiff, Defendant Officers told him that if anyone asked, Plaintiff was to say that the officers treated him fairly, and if he failed to do so, Defendant Officers would take him back to the Area 2 basement.  (*Id.* ¶ 46.)  Defendant Dignan then turned on a hose, washed the blood off of Plaintiff's shirt, jacket, and mouth, and took him upstairs to an Area 2 interrogation room.  (*Id.* ¶ 47.)

Shortly thereafter, Plaintiff met with the felony review ASA Defendant Paul Kelly in the presence of Defendants Dignan and Byrne and recited the fabricated story that Defendant Officers told him in the Area 2 basement.  (*Id.* ¶¶ 44, 45, 49.)  When Plaintiff was repeating the story in front of a court reporter, he forgot some of the details, after which Defendant Dignan handed note cards to Defendant Kelly that prompted Defendant Kelly to go over various parts of the story again.  (*Id.* ¶ 50.)  Defendant Kelly obtained a signed court-reported statement from Plaintiff at that time.  (*Id.* ¶ 51.)

## IV.  Plaintiffs' Pre-Trial Suppression Motion and Trial

Plaintiff alleges that Defendants Dignan and Byrne memorialized his false, fabricated, and coerced confession in official reports and that these fabricated reports omitted any mention

that the confession was the product of the torture. (*Id.* ¶ 52.) The attorneys who prosecuted Plaintiff relied upon these false official reports to secure Plaintiff's wrongful charging, prosecution, conviction, and imprisonment. (*Id.*) In the interim, on January 24, 1983, officials brought Plaintiff to court for a bond hearing. (*Id.* ¶ 53.) Prior to the hearing, Plaintiff informed Defendant Dignan that he was going to tell the bond court that the officers had beat him. (*Id.*) Defendant Dignan responded by stating that no judge or jury would believe the word of a "nigger" over a word of a white police officer. (*Id.* ¶ 54.) At his bond hearing, Plaintiff testified that two white police officers beat him in the basement of Area 2 Police Headquarters. (*Id.* ¶ 55.) He also identified Detective Dignan, who was present in courtroom, as one of the detectives who beat him. (*Id.*)

On June 1, 1983, Plaintiff's defense counsel filed a pre-trial motion to suppress Plaintiff's inculpatory statements asserting that they were involuntary and the result of Defendant Officers' "grueling" interrogation, involving "severe" and "excessive police brutality." (*Id.* ¶ 56.) The State called Defendants Kelly, Byrne, and Dignan at the suppression hearing. (*Id.* ¶ 57.) Prior to testifying at the suppression hearing, Defendants Byrne and Dignan told the prosecuting attorneys that they did not physically or psychologically coerce Plaintiff into giving a false and fabricated confession. (*Id.* ¶ 58.) During the suppression hearing, Defendants Byrne and Dignan denied that they had physically abused Plaintiff and Defendant Kelly denied that he was aware of any such abuse. (*Id.* ¶¶ 59, 60.) According to Plaintiff, Defendants Byrne, Dignan, and Kelly offered false and perjured testimony at his motion to suppress (and trial) in order to suppress and cover-up evidence of police torture and abuse at Area 2. (*Id.* ¶¶ 63, 69, 70.) Plaintiff also asserts that, in June 1983, evidence of the systemic Area 2 torture and abuse

was not available to him, and thus he could not offer any such evidence at his suppression

hearing. (*Id.* ¶¶ 61, 62.) At the conclusion of the evidence, the Circuit Court of Cook County

judge denied Plaintiff's motion to suppress his coerced confession. (*Id.* ¶ 63.)

At Plaintiff's 1984 criminal trial, the prosecuting attorneys called Defendants Byrne,

Dignan, and Kelly to testify on the State's behalf. (*Id.* ¶ 64.) The Cook County State's

Attorneys used Plaintiff's coerced and fabricated confession as the chief piece of incriminating

evidence against him at trial. (*Id.* ¶ 67.) Following his July 1984 trial, the jury convicted

Plaintiff of murder, home invasion, and armed robbery. (*Id.* ¶ 68.) The Cook County judge

sentenced Plaintiff to 40 years for the murder conviction and 20 years each for the home

invasion and armed robbery – to be served concurrently. (*Id.*) Plaintiff asserts that without

Defendant Officers' physically coercive interrogation, fabrication of his confession, and the

suppression of exculpatory evidence, the Cook County State's Attorney would not have

prosecuted him and convicted him of the murder, home invasion, and robbery. (*Id.* ¶ 67.)

## ANALYSIS

**I.     Due Process Right to a Fair Trial – Count I**

In Count I of his Complaint, Plaintiff alleges that Defendants violated his Fifth and

Fourteenth Amendment due process rights to a fair trial by deliberately withholding exculpatory

evidence and fabricating evidence.[3]

---

[3] In Count I, Plaintiff also brings a malicious prosecution claim under 42 U.S.C. § 1983 to preserve this claim for appeal in light of the United States Supreme Court's grant of certiorari in *Manuel v. City of Joliet*, 590 F. App'x 641, 642 (7th Cir. 2015), *cert. granted sub nom. Manuel v. City of Joliet, Ill.,* 136 S. Ct. 890 (2016), involving the issue of whether the existence of a federal malicious prosecution claim depends on the availability of a state remedy. *See Newsome v. McCabe,* 256 F.3d 747 (7th Cir. 2001). Therefore, the Court grants – without prejudice – Defendants' motions to dismiss this claim.

## A.        Brady Claim

Plaintiff first asserts that all of the individual Defendants violated his due process rights to a fair trial by deliberately withholding exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See Saunders-El v. Rohde,* 778 F.3d 556, 561 (7th Cir. 2015) ("A criminal defendant's *Brady* right is one that 'the Constitution provides as part of its basic 'fair trial' guarantee.'") (quoting *United States v. Ruiz*, 536 U.S. 622, 626, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002)). The duty to disclose under *Brady* applies to police officers. *See Youngblood v. W. Virginia,* 547 U.S. 867, 869-70, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) (per curiam); *Newsome v. McCabe,* 256 F.3d 747, 752-53 (7th Cir. 2001). "A plaintiff must show three elements in order to prove a *Brady* violation: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) the evidence must have been material, meaning there is a reasonable probability that the result of the proceeding would have been different." *Beaman v. Freesmeyer,* 776 F.3d 500, 506 (7th Cir. 2015). Under the last element, a plaintiff "need only show that the new evidence undermines the confidence of the verdict." *Id.* (citation omitted); *see also Wearry v. Cain*, 136 S.Ct. 1002, 1006 (2016) (per curiam) (petitioner "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict.").

Here, Defendants argue that Plaintiff's *Brady* claim is foreclosed by the Seventh Circuit's decision in *Saunders-El* because Plaintiff bases his *Brady* claim solely on Defendant Officers' failure to disclose the fact that they allegedly fabricated Plaintiff's confession. In the context of police officers remaining silent following the coerced confession and fabrication of evidence, the

*Saunders-El* court reasoned:

> In the end, Saunders–El seeks to charge the officers with a *Brady* violation for keeping quiet about their wrongdoing, not for failing to disclose any existing piece of *evidence* to the prosecution. But our case law makes clear that *Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution. Accordingly, Saunders–El's *Brady* claim is more appropriately characterized as a claim for malicious prosecution – that is, a claim that the officers commenced his prosecution without probable cause – which cannot form the basis of a constitutional tort.

*Id*. at 562 (emphasis in original). The *Saunders-El* decision is premised on earlier Seventh Circuit cases, including *Sornberger v. City of Knoxville,* 434 F.3d 1006, 1029 (7th Cir. 2006), in which the Seventh Circuit concluded that *Brady* cannot be a basis for a claim against police officers who fail to disclose the circumstances of a plaintiff's interrogation. The *Saunders-El* decision also relied on *Gauger v. Hendle,* 349 F.3d 354, 360 (7th Cir. 2003), where the Seventh Circuit rejected "the plaintiff's argument that *Brady* requires police to disclose truthful versions of statements made during interrogations." *Saunders-El,* 778 F.3d at 562. The *Gauger* court reasoned that the obligation under *Brady* "falls out, because Gauger knew what he had said at the interrogation." *Id.* at 360.

Reviewing Plaintiff's well-pleaded allegations and all reasonable inferences in his favor – as the Court is required to do at this procedural posture – Plaintiff bases his *Brady* violation on more than just Defendant Officers' failure to disclose their unlawful interrogation tactics in relation to his coerced confession. Specifically, Plaintiff alleges that Defendant Officers suppressed the implements of their torture, including the plastic bag, the rubber nightstick, and Plaintiff's bloody clothes. (Compl. ¶¶ 61, 67, 70.) More importantly, Plaintiff alleges that Defendants suppressed and destroyed evidence of systemic torture and abuse in Area 2,

obstructed investigations into the CPD's systemic torture, and discredited findings of systemic torture.  (*Id*. ¶¶ 96, 99, 102, 115, 122.)

With the Seventh Circuit's *Gauger* and/or *Sornberger* decisions in mind, courts in this district have concluded that similar allegations state a *Brady* claim based on events that transpired outside of the interrogation room.  *See Tillman v. Burge,* 813 F. Supp. 2d 946, 962 (N.D. Ill. 2011) (allegations of "'suppressing, destroying, and preventing the discovery' of exculpatory evidence, including that of 'the instruments of torture,'" and "obstructing and improperly influencing investigations" are "circumstances that substantially exceed what Tillman was aware of based on his presence at the interrogation"); *Cannon v. Burge*, No. 05 C 2192, 2006 WL 273544, at *12 (N.D. Ill. Feb. 2, 2006) ("Plaintiff's knowledge of what transpired in the interrogation room does not relieve the City Defendants of their obligation under *Brady* to disclose exculpatory evidence regarding what transpired outside the interrogation room, or preclude the Court from finding the existence of a *Brady* violation."); *Patterson v. Burge,* 328 F. Supp. 2d 878, 889 (N.D. Ill. 2004) ("in addition to charging defendants with hiding the fact that his confession was coerced and fabricated – an allegation which by itself might not state a *Brady* claim after *Gauger* – Patterson accuses defendants of obstructing justice and violating his right to a fair trial through actions they took outside the interrogation room."); *see also Ruiz-Cortez v. City of Chicago,* No. 11 C 1420, 2016 WL 6270768, at *16 (N.D. Ill. Oct. 26, 2016) (Plaintiff's claims "relate to things that ranged far outside Plaintiff's knowledge," including a "pattern of misconduct and obstruction of justice.").  The decision in *Saunders-El* does not change this reasoning as it relates to Plaintiff's allegations of Defendants suppressing the implements of their torture, destroying evidence of systemic torture and abuse in Area 2,

obstructing investigations into the CPD's systemic torture, and discrediting findings of systemic torture. In sum, at this stage of the proceedings, Plaintiff's allegations are distinguishable from the facts in *Saunders-El* because Plaintiff is not merely basing his *Brady* claim on Defendants "keeping quiet about their wrongdoing." *Saunders-El*, 778 F.3d at 562.

Defendants nonetheless argue that Plaintiff has "pleaded himself out of court" by alleging that Defendant Daley and other high ranking Assistant State's Attorneys were aware of the Area 2 torture as early as 1982. *See O'Gorman v. City of Chicago,* 777 F.3d 885, 889 (7th Cir. 2015) ("A complainant can plead himself out of court by including factual allegations that establish that the plaintiff is not entitled to relief as a matter of law."). To clarify, "a police officer's *Brady* obligations are discharged by disclosing material exculpatory evidence to the prosecutor, for it is the prosecutor's responsibility to turn the evidence over to defense counsel." *Beaman*, 776 F.3d at 512. In other words, Defendants argue that because the State's Attorney's Office was aware of the Area 2 torture as early as 1982, the prosecutors already knew the very *Brady* material at issue in Plaintiff's claim.

Defendants' argument does not take into account Plaintiff's conspiracy allegations – discussed in detail below – in which he states that Defendant Daley (as State's Attorney and Chicago's Mayor), the State's Attorney's Office, and the CPD, among others, conspired with each other to deprive Plaintiff of his constitutional right to a fair trial by withholding exculpatory evidence of a pattern and practice of torture in Area 2. (Compl. ¶¶ 118, 121, 122, 133-35.) Indeed, the Seventh Circuit has rejected a similar argument that police officers discharge their *Brady* duties when they disclosed exculpatory evidence to a prosecutor who was part of the alleged conspiracy. *See Whitlock v. Brueggemann,* 682 F.3d 567, 576 (7th Cir. 2012) ("It is not

likely that the police may take shelter behind a prosecutor who is conspiring with them to fabricate false evidence against innocent suspects."). As such, under *Whitlock* and Plaintiff's conspiracy allegations, Plaintiff has not "pleaded himself out of court" as Defendants argue.

Next, Defendants contend that Plaintiff's claim fails because *Brady* "deals with the concealment of exculpatory evidence unknown to the defendant," *see Harris v. Kuba,* 486 F.3d 1010, 1015 (7th Cir. 2007), and Plaintiff and his criminal defense attorney should have been aware of Area 2's pattern and practice of torture and abuse. Defendants specifically assert that the Andrew Wilson case was highly-publicized before Plaintiff's 1984 criminal trial. *See People v. Wilson,* 116 Ill. 2d 29 (1987). Wilson's convictions stemmed from an occurrence that occurred in February 1982, his first criminal trial took place in 1983, and, in 1987, the Supreme Court of Illinois reversed and remanded Wilson's convictions based on the involuntariness of his coerced confession. *See id.* at 41-42; *see also United States v. Burge,* 711 F.3d 803, 814 (7th Cir. 2013). That Plaintiff and his defense counsel should have known about Area 2's pattern of torture and abuse based on the 1983 Wilson trial asks the Court to ignore Plaintiff's well-pleaded allegations that evidence of the systemic Area 2 torture and abuse was not available to Plaintiff or his counsel at the time of his 1983 suppression hearing. (Compl. ¶¶ 61, 62.) Also, Defendants' argument asks the Court to make an unreasonable factual inference at this procedural posture, namely, that defense counsel and Plaintiff should have known about systemic torture in Area 2 well before evidence relating to this pattern and practice was readily available. *See People v. Patterson,* 192 Ill. 2d 93, 109 (2000); *Wilson,* 116 Ill. 2d at 35-36.

Defendants' argument fails at this juncture.[4]

Defendants further argue that Plaintiff cannot base his *Brady* claim on evidence that occurred after his criminal trial in 1984. *See Steidl v. Fermon,* 494 F.3d 623, 625 (7th Cir. 2007) ("We agree with the district court that the *Brady* line of cases has clearly established a defendant's right to be informed about exculpatory evidence throughout the proceedings, including appeals and authorized post-conviction procedures, *when that exculpatory evidence was known to the state at the time of the original trial*.") (emphasis added). Plaintiff, however, explains that he has set forth the circumstances of other Area 2 victims in his Complaint to support the premise that there was ongoing suppression of the pattern of systemic torture at the direction of Defendant Burge and CPD Detectives under his command. In doing so, Plaintiff has sufficiently alleged Defendant Burge's involvement as a supervisor of Detectives Byrne and Dignan and that Defendant Burge was directly involved in the deprivation of his constitutional rights when he was present in Area 2 on January 21, 1983 and told Plaintiff that the officers would make him talk. *See Matthews v. City of E. St. Louis,* 675 F.3d 703, 708 (7th Cir. 2012) ("To show personal involvement, the supervisor must 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'") (citation omitted). That Plaintiff included other allegations of torture and abuse at the hands of Defendant Burge further supports Plaintiff's claim that Defendant Burge and CPD Detectives under his command created an environment allowing for the torture and abuse of African-American suspects.

---

[4] Defendants' reliance on the summary judgment ruling in *Orange v. Burge,* No. 04 C 0168, 2008 WL 4425427, at *10 (N.D. Ill. Sept. 25, 2008), is misplaced because evidence in that record revealed that plaintiff's counsel was aware of Wilson's allegations and did not seek more information regarding the pattern and practice of Area 2's torture and abuse.

In addition, the individual Defendants argue that qualified immunity protects them from liability as to Plaintiff's *Brady* claim. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes,* ___ U.S. ___, 135 S.Ct. 2042, 2044, 192 L.Ed.2d 78 (2015) (internal quotation marks omitted). In evaluating qualified immunity, courts consider: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Locke v. Haessig,* 788 F.3d 662, 667 (7th Cir. 2015). "A plaintiff can show that a right is 'clearly established' by statute or constitution in at least two ways: (1) he can point to a clearly analogous case establishing the right to be free from the conduct at issue; or (2) he can show that the conduct was 'so egregious that no reasonable person could have believed that it would not violate established rights.'" *Beaman,* 776 F.3d at 508.

Defendants argue that their "the failure to disclose the alleged torture evidence did not in 1984 and does not today violate any clearly established constitutional right." (R. 48-1, Defs.' Brief, at 29.) In making this argument, Defendants characterize Plaintiff's *Brady* claim as follows: "Plaintiff has essentially alleged that *Brady* requires police officers to disclose their misconduct, including criminal misconduct, to criminal defendants." (R. 68, Reply Brief, at 22.)

First, Defendants mischaracterize Plaintiff's *Brady* claim, which includes allegations that Defendants suppressed and destroyed evidence of systemic torture and abuse in Area 2, obstructed investigations into the CPD's systemic torture, and discredited findings of systemic torture. Second, Defendants fail to explain how it was not clearly established in 1983-84 that

destroying and suppressing exculpatory evidence was unconstitutional.  In fact, since *Brady* and

*Killian v. United States,* 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961), "bad-faith

destruction or loss of exculpatory evidence violate[s] a suspect's due process rights."  *Armstrong*

*v. Daily*, 786 F.3d 529, 532 (7th Cir. 2015); *see also Tillman,* 813 F. Supp. 2d at 966 n.12.

Moreover, viewing Plaintiff's allegations and all reasonable inferences in his favor, his

allegations show that Defendants' conduct was "so egregious that no reasonable person could

have believed that it would not violate established rights."  *Beaman,* 776 F.3d at 508-09.  The

Court therefore denies Defendants' motion to dismiss Plaintiff's *Brady* claim.

### B.  Fabricating Evidence Claim

In Count I of his Complaint, Plaintiff also alleges that Defendants violated his due

process rights because Defendant Officers fabricated his confession by instructing him exactly

what to say after they had tortured him.  (Compl. ¶¶ 43, 44.)  Plaintiff asserts that Defendants

Dignan and Byrne memorialized his false, fabricated, and coerced confession in official reports

and that these fabricated reports omitted any mention that the confession was the product of the

torture and police brutality.  (*Id.* ¶ 52.)  Additionally, Plaintiff alleges that the felony review

attorney, Defendant Kelly, was complicit in Defendant Officers' conduct because he encouraged,

condoned, and permitted Defendants Burge, Dignan, and Byrne's use of torture to coerce false

and fabricated confessions.  (*Id.* ¶ 128.)  Plaintiff contends that the attorneys who prosecuted him

relied upon these false official reports to secure his wrongful charging, prosecution, conviction,

and imprisonment.  (*Id.*)

"[A] police officer who manufactures false evidence against a criminal defendant

violates due process if that evidence is later used to deprive the defendant of [his] liberty in some

way." *Saunders-El*, 778 F.3d at 560 (quoting *Whitlock,* 682 F.3d at 580); *see also Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) (*Fields II*). As the Seventh Circuit recently observed, "[a]llegations of evidence fabrication may state a colorable due-process claim in the wake of our decisions in *Whitlock* and *Fields II*," but "an act of evidence fabrication doesn't implicate due-process rights *unless* the fabricated evidence 'is later used to deprive the [criminal] defendant of her liberty in some way.'" *Bianchi v. McQueen,* 818 F.3d 309, 319 (7th Cir. 2016) (emphasis in original) (quoting *Whitlock*, 682 F.3d at 580).

Examining the well-pleaded facts as true and all reasonable inferences in Plaintiff's favor, not only does Plaintiff allege that Defendant Officers created his false confession, he alleges that his false, fabricated, and coerced confession was a product of torture. (Compl. ¶¶ 30-46.) Further, Plaintiff asserts that Defendants Byrne and Dignan falsely informed the prosecuting attorneys that they did not physically or psychologically coerce him into giving a false and fabricated confession. (*Id.* ¶ 52.) Other allegations and reasonable inferences that support Plaintiff's due process fabrication claim include that Defendant Officers memorialized Plaintiff's false confession on note cards in anticipation that Plaintiff would forget his own "confession" and to assist Plaintiff in making his false confession to Defendant Kelly. (*Id.* ¶ 50.) Furthermore, Plaintiff unequivocally alleges that the attorneys who prosecuted him relied upon the false official reports containing the fabricated confession to secure Plaintiff's wrongful charging, prosecution, conviction, and imprisonment. (*Id.* ¶ 52.) These allegations plausibly suggest that Plaintiff has a right to relief above the speculative level under *Bianchi, Fields II,* and *Whitlock*. *See Twombly,* 550 U.S. at 555.

Defendants, however, argue that Plaintiff's allegations are inadequate because he has failed to sufficiently allege that Defendant Officers knew the fabricated evidence was false. *See Petty v. City of Chicago,* 754 F.3d 416, 422 (7th Cir. 2014) ("In fabrication cases, the police or prosecutor manufactures evidence that he knows to be false."). It appears that Defendants are arguing that Plaintiff has alleged that Defendant Officers merely coerced his confession – not that they fabricated evidence. *See id.* at 423; *Fields II,* 740 F.3d at 1122. Again, construing Plaintiff's allegations and all reasonable inferences in his favor, he has alleged more than Defendant Officers coerced his confession by torturing him, he has set forth factual details regarding Defendant Officers' fabrication of a story that became his confession. (*Id.* ¶¶ 43, 58, 65-67.) In short, Plaintiff has sufficiently alleged that Defendant Officers knew his confession was false because Defendant Officers manufactured it themselves. Plaintiff need not allege more to fulfill the federal pleading requirements. *See Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). The Court therefore denies Defendants' motion to dismiss in this respect.

## II.    Coercive Interrogation – Count II

In Count II, Plaintiff brings a coercive interrogation claim under the Fifth and Fourteenth Amendments against Defendants Martin, Kelly, Burge, Byrne, and Dignan. The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself," and prohibits the use of a compelled statement against an individual at his criminal trial. *See Chavez v. Martinez*, 538 U.S. 760, 767, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (plurality opinion); *id.* at 778 (Souter, J., concurring in judgment); *Sornberger,* 434 F.3d

at 1024.  A plaintiff may also bring a Fourteenth Amendment substantive due process claim based on "police torture or other abuse that results in a confession."  *Chavez,* 538 U.S. at 773; *see, e.g., Wilson v. City of Chicago,* 6 F.3d 1233, 1236 (7th Cir. 1993).  As the Supreme Court teaches, "[c]onvictions based on evidence obtained by methods that are so brutal and offensive to human dignity that they shock the conscience violate the Due Process Clause."  *Chavez,* 538 U.S. at 774 (citation and quotation omitted).

Here, Defendants argue that Plaintiff's coerced interrogation claim is untimely because Plaintiff had two years from the time his claim accrued in 1984 to bring this claim.  *See Moore v. Burge,* 771 F.3d 444, 446 (7th Cir. 2014) ("the statute of limitations for § 1983 actions in Illinois is only two years.").  Defendants base their argument on the Supreme Court's holding in *Wallace v. Kato,* 549 U.S. 384, 393-94, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007), which held that "a claim that accrues before a criminal conviction may and usually must be filed without regard to the conviction's validity," in relation to Fourth Amendment claims.  Plaintiff, on the other hand, maintains that under *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), his coerced interrogation claim did not accrue until the Illinois court vacated his criminal conviction and the State dismissed all charges against him on October 19, 2015.  *See Moore,* 771 F.3d at 446 ("*Heck* holds that a claim that implies the invalidity of a criminal conviction does not accrue, and the statute of limitations does not begin to run, until the conviction is set aside by the judiciary or the defendant receives a pardon.").

When considering whether *Wallace* trumps *Heck* in the context coercive interrogation claims, courts in this district "have concluded that where ... the plaintiff's conviction rested largely upon the allegedly coerced confession, a coercive interrogation claim necessarily

20

impugns the validity of the conviction." *Tillman,* 813 F. Supp. 2d at 970 (collecting cases). In this context, Defendants argue that – under their version of the facts – there is significant evidence supporting Plaintiff's conviction beyond his coerced confession, and thus his coerced confession did not necessarily impugn the invalidity of his conviction as required by *Heck.* At this procedural posture, however, the Court must construe Plaintiff's allegations and all reasonable inferences in his favor. With this standard in mind, Plaintiff unequivocally alleges that the State used his coerced and fabricated confession as the chief piece of incriminating evidence against him at trial. Plaintiff also alleges that without Defendant Officers' physically coerced and fabricated confession from Plaintiff, the Cook County State's Attorney would not have prosecuted him and convicted him of the murder, home invasion, and robbery. Under these facts, Plaintiff has sufficiently alleged that his coerced confession impugned the validity of his conviction. The Court therefore denies Defendants' motions to dismiss Plaintiff's coerced interrogation claim as untimely.

As to Defendant Martin's argument that he was not personally involved in Plaintiff's coercive interrogation, the Court notes that a defendant is personally involved in a constitutional deprivation "if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent." *Wilson v. Warren Cnty., Ill.*, 830 F.3d 464, 469 (7th Cir. 2016) (citation omitted). Plaintiff has alleged detailed facts that Defendant Martin, who was Defendant Burge's direct supervisor, was not only aware of Defendant Officers' coercive interrogations, but that he was involved in the alleged conspiracy to cover-up and suppress the systemic coercive interrogations at Area 2, as examined below. (Compl. ¶¶ 10, 71, 89.) Moreover, Plaintiff has sufficiently alleged a failure to intervene claim against Defendant Martin discussed in the next

section of this ruling.  Therefore, Defendant Martin's argument fails at this stage of the proceedings.

## III.    Failure to Intervene – Counts I and II

Defendants further assert that Plaintiff's failure to intervene claim is inadequately plead because he does not identify the conduct that required intervention, whether Defendants had knowledge of the illegal conduct, and if Defendants had a realistic opportunity to prevent it.  *See Lewis v. Downey,* 581 F.3d 467, 472 (7th Cir. 2009); *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994).  On the contrary, Plaintiff has sufficiently set forth his failure to intervene claim under the federal pleading standards by alleging that Defendants Byrne, Dignan, and Burge caused his wrongful charging, prosecution, conviction, and imprisonment by physically coercing him, fabricating his false confession, and withholding and suppressing exculpatory evidence.  In addition, Plaintiff contends that Defendants Burge, Byrne, and Dignan failed to intervene or stop each other's misconduct despite having the opportunity to do so.  As to the felony review ASA, Defendant Kelly, Plaintiff sufficiently alleges that Defendant Kelly was an active participant, who conspired with Defendant Officers Burge, Dignan, and Byrne in producing the coerced and fabricated confession, as well as covering-up and suppressing their actions before and during Plaintiff's criminal proceedings.  *See Rivera v. Lake Cnty.,* 974 F. Supp. 2d 1179, 1191 (N.D. Ill. 2013) (failure to intervene claim against prosecutor acting in investigatory capacity survives Rule 12(b)(6) motion to dismiss); *Saunders v. City of Chicago,* No. 12 C 9158, 2013 WL 6009933, at *10 (N.D. Ill. Nov. 13, 2013) (court "disinclined to foreclose the possibility of extending failure to intervene liability to prosecutors in this case, in large part, because the Seventh Circuit's recent decision in *Whitlock* suggests that prosecutors and police are subject to

the same duties when acting in an investigatory capacity.").  In sum, Plaintiff's allegations are facially plausible because he has sufficiently alleged that each of these Defendants knew that Defendant Officers were committing constitutional violations and had the opportunity to intervene, yet failed to do so.  *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *see, e.g., Starks v. City of Waukegan,* 946 F. Supp. 2d 780, 790 (N.D. Ill. 2013).

In regard to Defendants Daley and Martin, Plaintiff alleges that – as supervisors – they repeatedly failed to intervene to prevent Defendants Burge, Byrne, Dignan, and their co-conspirators from continuing the coercive interrogations and torture tactics by investigating, removing, or disciplining them when Defendants Martin and Daley first learned of their criminal conduct.[5]  (*Id*. ¶¶ 89, 90, 129.)  Plaintiff alleges specific details about Defendant Daley's knowledge of the torture and abuse, including that in 1982 the CPD Superintendent sent a letter to him about Andrew Wilson's torture at the hands of Defendant Burge informing Defendant Daley that he would not investigate this matter without instructions from Defendant Daley as Cook County's State's Attorney.  (*Id*. ¶ 79.)  Defendant Daley never responded to the Superintendent's letter.  (*Id*. ¶ 80.)  Plaintiff further contends that as a result of Defendant Daley's refusal to act, the CPD and OPS indefinitely suspended all allegations into the torture and abuse at Area 2.  (*Id*. ¶ 82.)  Moreover, according to Plaintiff, Defendants Martin and Daily, and later Defendant Hillard, covered-up the police misconduct instead of investigating it.  (*Id*. ¶¶

---

[5]  The Court discusses Defendant Daley's prosecutorial immunity arguments in the last section of this ruling.

71, 93, 139(c), (g), 140.)  In essence, Plaintiff asserts that Defendants Martin, Daley, and Hillard

as supervisors had knowledge of the systemic torture leading to coerced confessions of innocent

individuals, but nevertheless condoned it or turned a blind eye to it.  *See Matthews,* 675 F.3d at

708 ("To show personal involvement, the supervisor must 'know about the conduct and facilitate

it, approve it, condone it, or turn a blind eye for fear of what they might see.'") (citation

omitted).  The fact that Defendants Daley, Martin, and Hillard were not at Area 2 at the time of

Plaintiff's torture and coerced confession does not absolve these Defendants under Plaintiff's

theory of liability.  *See Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir. 2001) (supervisor

"does not have to have participated directly in the deprivation" to be personally involved).

## IV.     Federal Conspiracy and State Law Conspiracy Claims – Count III and VII

In Counts III and VII, Plaintiff brings federal and state law conspiracy claims against

Defendants Burge, Byrne, Dignan, Kelly, Martin, Shines, Needham, Hillard, and Daley.  *See* 42

U.S.C. §§ 1983, 1985(3), 1986.  To sufficiently allege a conspiracy claim under federal law,

Plaintiff must set forth the parties to the conspiracy, the purpose of the conspiracy, and the

approximate dates of the conspiracy.  *See Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir. 2009);

*Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006); *Thomas v. City of Blue Island*, 178 F.

Supp. 3d 646 (N.D. Ill. 2016); *see also Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d

806, 820 (7th Cir. 2015) (section 1985(3) "makes it unlawful to commit certain acts, such as

conspiring to deprive a person or class of persons of the equal protection of the laws").  Under

Illinois law, a "complaint must do more than merely characterize a combination of acts as a

conspiracy," it must allege the "'necessary and important element' of an agreement."  *Merrilees*

*v. Merrilees,* 998 N.E.2d 147, 162 (1st Dist. 2013) (citation omitted); *see also McClure v. Owens*

*Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999) ("Civil conspiracy is defined as 'a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means.") (citation omitted).

Construing the well-pleaded facts as true and all reasonable inferences in Plaintiff's favor, he has alleged that Defendants Burge, Byrne, Dignan, Martin, Shines, Hillard, Needham, Kelly, and Daley, along with certain other co-conspirators, colluded and conspired to deprive Plaintiff, who is African-American, of his constitutional rights, including his right to a fair and impartial trial and equal protection of the law. (Compl. ¶¶ 93, 118, 121, 122, 127, 133, 134.) Plaintiff, for example, sets forth facts that Defendants made extraordinary efforts to suppress, conceal, and discredit exculpatory evidence regarding the pattern of torture and physical abuse of African-American men by CPD detectives under Defendant Burge's command. (*Id.* ¶ 93.) In addition, Plaintiff states that all of the named Defendants – jointly and with other police and prosecutorial investigative, supervisory, and command personnel – reached an understanding, engaged in an ongoing course of conduct, and otherwise conspired and continue to conspire to deprive Plaintiff of his constitutional rights. (*Id.* ¶ 118.) Plaintiff further asserts that the Defendant Burge and other Chicago Police Detectives began their unlawful conspiracy as early as 1973, and that it lasted through Plaintiff's interrogation and torture in 1983 and conviction in 1984 and continued throughout his incarceration. (*Id.* ¶¶ 72, 22-50, 73-86.) According to Plaintiff, the conspiracy involved a pattern and practice at Area 2 (and Area 3) of torturing African-American suspects into falsely confessing to crimes they did not commit and that the conspiracy was motivated by racial animus. (*Id.* ¶¶ 72, 74, 76.)

Plaintiff specifically sets forth the role of each Defendant in the alleged conspiracy. *See Iqbal,* 556 U.S. at 676 ("a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). In particular, Plaintiff alleges that Defendants Daley, Martin (as Defendant Burge's supervisor and later as CPD's Superintendent), Shines, Needham, and Hillard, acted jointly and conspired with each other, to wrongfully sustain his conviction by covering-up and concealing Defendant Burge's systemic use of torture and by failing to investigate it. (*Id.* ¶¶ 90, 91, 93, 102.) Furthermore, Plaintiff contends that once Defendant Daley became Chicago's Mayor in 1989, he was directly responsible for the operations of the CPD, yet he failed to take the necessary steps against Defendant Burge and his confederates, despite Defendant Daley's knowledge of the pattern and practice of abuse and torture at Area 2. (*Id.* ¶¶ 94, 95, 96, 103.) In his Complaint, Plaintiff sets forth additional details of the conspiracy, including that Defendant Martin delayed and undermined OPS's investigations that implicated him, as well as Defendants Byrne, Dignan, and Burge. (*Id.* ¶ 99, 100.) According to Plaintiff, Defendants Daley and Martin (until at least 1992) also publically discredited OPS investigations into the systemic torture and abuse at Area 2. (*Id.* ¶¶ 104, 107.) Although aware of the allegations of abuse and torture at Area 2, Defendant Shines, as Director of OPS, acted in collusion with her co-conspirators and refused to investigate certain allegations of police torture and suppressed any such findings. (*Id.* ¶¶ 105, 111, 113.) As part of this conspiracy, Plaintiff further asserts that Defendants Hillard and Needham (Defendant Hillard's chief administrator), with full knowledge that Defendants Burge, Byrne, Dignan, and other Area 2 and Area 3 detectives, participated in a pattern and practice of torture and abuse of suspects, violated police regulations, and obstructed justice by overturning certain OPS sustained

findings.  (*Id.* ¶ 113.)  Plaintiff maintains that Defendants Hillard and Needham also refused to investigate Defendant Shines' suppression of evidence in her role as OPS' Director.  (*Id.*)  Similarly, Plaintiff alleges that after his conviction and sentence, Defendants Martin, Shines, Hillard, and Needham acted in collusion with Defendant Daley and other high-ranking police officials to deflect public scrutiny of Defendant Burge's actions that deprived Plaintiff of information regarding the scope and nature of the systemic misconduct prolonging his unlawful incarceration.  (*Id.* ¶¶ 93, 118.)  Viewing the allegations and all reasonable inferences in Plaintiff's favor, his detailed allegations state a facially plausible conspiracy claim under the circumstances.  *See Carlson v. CSX Transp., Inc.,* 758 F.3d 819, 827 (7th Cir. 2014) (to state a facially plausible claim, a "plaintiff must include 'enough details about the subject-matter of the case to present a story that holds together.'") (citation omitted); *Orange v. Burge,* No. 04 C 0168, 2005 WL 742641, at *13 (N.D. Ill. Mar. 30, 2005) (plaintiff's allegations "that Martin, Shine, Hillard and Needham participated in covering up alleged torture, failing to investigate and suppressing of information" establish personal liability); *see also Tillman,* 813 F.Supp.2d at 976-78; *Cannon*, 2006 WL 273544, at *14.

Additionally, Plaintiff alleges that an underlying conspiracy exists that is the premise for the cover-up conspiracy, namely, that Defendants Byrne, Burge, Dignan, and Kelly acted jointly and in conspiracy with each other to wrongfully secure Plaintiff's conviction.  As examined above, Plaintiff has set forth detailed factual allegations that Defendants Burge, Byrne, Dignan, and Kelly reached an understanding to coerce confessions by torture and then suppress information pertaining to the torture and abuse of African-American suspects at Area 2 and later at Area 3.  (Compl. ¶¶ 61, 70, 89, 93.)  Further, Plaintiff maintains that this conspiracy is

reflected by Defendants' false and perjured testimony at his criminal proceedings.  (*Id*. ¶¶ 52, 54,

57, 58, 63, 69, 70.)  Based on Plaintiff's detailed allegations concerning this conspiracy – as

discussed throughout this ruling – he has stated a plausible claim for relief under *Iqbal* and

*Twombly*.  *See Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim

for relief" is "a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense.").

On a final note, because Plaintiff has sufficiently alleged constitutional deprivations, as

well as violations of Illinois law, examined below, Defendants' argument that Plaintiff's

conspiracy claims are not actionable necessarily fails.  *See, e.g., Tillman,* 813 F.Supp.2d at 976;

*see also Fiala v. Bickford Sr. Living Grp., LLC,* 43 N.E.3d 1234, 1250 (2d Dist. 2015) ("A civil-

conspiracy claim extends liability in tort beyond the active tortfeasor to those who have planned,

assisted, or encouraged the tortfeasor's conduct.").  The Court therefore denies Defendants'

motions to dismiss Plaintiff's conspiracy claims as alleged in Counts III and VII of the

Complaint.

## V.      Monell Claim – Count IV

In Count IV of his Complaint, Plaintiff alleges that the City of Chicago is liable for his

constitutional deprivations pursuant *Monell v. Department of Social Servs.*, 436 U.S. 658, 98

S.Ct. 2018, 56 L.Ed.2d 611 (1978).  To recover under *Monell*, Plaintiff must eventually establish

that (1) he suffered a deprivation of a constitutional right; (2) as a result of an express municipal

policy, widespread custom, or deliberate act of a decision-maker with final policy-making

authority, that was (3) the cause of his constitutional injury.  *See Dixon v. Cnty. of Cook*, 819

F.3d 343, 348 (7th Cir. 2016).  As discussed, Plaintiff has plausibly alleged violations of his

Fourteenth Amendment and Fifth Amendment rights under the federal pleading standards.

Moreover, Plaintiff alleges that the CPD had a de facto pattern and practice of systemic torture

and physical abuse of African-American suspects at Area 2, including the use of cattle prods,

electric shock boxes, plastic bags, telephone books, nightsticks, and shotguns; that certain

Defendants supervised, encouraged, sanctioned, condoned, and ratified brutality and torture by

other CPD detectives; and that Defendants' torture and abuse caused Plaintiff to falsely confess

to crimes that he did not commit. (*Id.* ¶¶ 2, 8, 70, 71, 88.) Examining these facts and all

reasonable inferences in Plaintiff's favor, he has plausibly alleged a *Monell* claim under the

dictates of *Iqbal* and *Twombly*.

Despite Plaintiff's well-pleaded allegations, the City argues that because Plaintiff has

failed to state an actionable constitutional violation, it cannot be liable under *Monell* citing *Los

Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). Over six years ago, the

Seventh Circuit rejected the argument that *Heller* requires individual officer liability before a

municipality can ever be held liable for under *Monell*. *See Thomas v. Cook County Sheriff's

Dept.*, 604 F.3d 293, 305 (7th Cir. 2010). Instead, the Seventh Circuit construed the *Heller*

holding more narrowly, namely, "a municipality can be held liable under *Monell,* even when its

officers are not, unless such a finding would create an inconsistent verdict." *Id.*; *see also

Swanigan v. City of Chicago,* 775 F.3d 953, 962 (7th Cir. 2015) ("In some civil-rights cases, [] a

verdict in favor of individual defendants would not necessarily be inconsistent with a plaintiff's

verdict on a factually distinct *Monell* claim."). The City has failed to address this distinction.

Because Plaintiff has plausibly alleged his *Monell* claim under the federal pleading standards and

the City has failed to address the *Thomas* distinction, the Court denies the City's motion to

dismiss Count IV of the Complaint.

**VI.     Common Law Malicious Prosecution Claim – Count V**

In Count V, Plaintiff alleges a common law malicious prosecution claim.  To prove the tort of malicious prosecution under Illinois law, a plaintiff must show the following elements: "(1) commencement or continuation of an original proceeding; (2) termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages." *Cairel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016); *see also Swick v. Liautaud,* 169 Ill.2d 504, 215 Ill.Dec. 98, 662 N.E.2d 1238, 1242 (1996)).  "The failure to establish any one element bars recovery." *Cairel,* 821 F.3d at 834.  In the present motion, Defendants argue that Plaintiff has failed to sufficiently allege the absence of probable cause, malice, and a termination of the criminal proceedings in Plaintiff's favor.  The Court addresses each argument in turn.

**A.     Absence of Probable Cause**

Defendants first contend that Plaintiff has failed to sufficiently allege the absence of probable cause.  In the context of a common law malicious prosecution claim in Illinois, "[p]robable cause is 'a state of facts that would lead a person of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person arrested committed the offense charged.'" *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 863 (7th Cir. 2010) (citation omitted); *see also Cairel,* 821 F.3d at 834.  As the Seventh Circuit explains, probable cause for a malicious prosecution claim "requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Swearnigen-El,* 602 F.3d 863 (citation omitted).

In Plaintiff's Complaint, he alleges that Defendants lacked probable cause to prosecute

30

him for crimes that he did not commit. (Compl. ¶¶ 1, 145.) These allegations are in the context of certain Defendants coercing Plaintiff's confession and prosecuting him based on a story Defendants invented, after which the resultant fabricated evidence was memorialized in official reports and used against Plaintiff in his criminal proceedings. (*Id*. ¶¶ 42-52.) Plaintiff's other factual allegations support a lack of probable cause, including Defendant Dignan's comment that no judge or jury would believe the word of a "nigger" over the word of a white police officer as it pertained to the alleged fabricated and coerced confession. Plaintiff's allegations that Defendant Officers handed Defendant Kelly note cards memorializing the alleged fabricated confession further underscores the lack of probable cause because Defendant Officers concocted probable cause by feeding Plaintiff a false confession. From Plaintiff's allegations, the Court can reasonably infer that Defendant Kelly knew Plaintiff's confession was coerced in light of Plaintiff's allegations that Defendant Officers physically beat and injured him. Under the circumstances, Plaintiff has sufficiently alleged lack of probable cause pursuant to the federal pleading standards. *See Twombly,* 550 U.S. at 570 (Complaint must have "enough facts to state a claim to relief that is plausible on its face.")

In an effort to refute these allegations, Defendants point to evidence outside of the pleadings, namely, an attachment to the City's joint motion to dismiss to which Plaintiff does not refer in his Complaint. *See Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.") (citations omitted). The attachment concerns eyewitness testimony about the perpetrator of the Fullilove murder. By pointing to this evidence, Defendants are attempting to rebut Plaintiff's probable cause

allegations with their own version of the facts. The Court has previously cautioned the City that a "defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations" because "[t]he attack is on the sufficiency of the complaint, and the defendant cannot set or alter the terms of the dispute, but must demonstrate that the plaintiff's claim, as set forth by the complaint, is without legal consequence." *Gomez v. Illinois State Bd. of Educ.,* 811 F.2d 1030, 1039 (7th Cir. 1987); *see, e.g., Turner v. City of Chicago,* No. 12 C 9994, 2013 WL 6797117, at *2 (N.D. Ill. Dec. 23, 2013); *Rutledge v. City of Chicago,* No. 13 C 0870, 2013 WL 6645510, at *3 (N.D. Ill. Dec. 17, 2013). This requirement holds true after the Supreme Court's decisions in *Iqbal and Twombly. See Iqbal,* 556 U.S. at 678 ("for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true"); *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam) ("when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."). Thus, Defendants' attempt to factually dispute Plaintiff's lack of probable cause allegations is unavailing at this procedural posture.

**B.**      **Malice**

Next, Defendants argue that Plaintiff has failed to sufficiently allege that they acted with malice, especially in light of the eyewitness testimony highlighted above. Again, the Court cannot properly consider this evidence nor will the Court convert the present Rule 12(b)(6) motion into a motion for summary judgment as Defendants' arguments suggest. *See City of Livonia Employees' Ret. Sys. v. Boeing Co.,* 711 F.3d 754, 761 (7th Cir. 2013). The Court therefore turns to whether Plaintiff has sufficiently alleged malice under the federal pleading standards, which is the proper inquiry at this juncture.

In the context of Illinois malicious prosecution claims, malice exists when the "the officer who initiated the proceedings was motivated by something other than a desire to bring a guilty party to justice." *Seiser v. City of Chicago,* 762 F.3d 647, 659 (7th Cir. 2014). Malice "can be inferred when a defendant lacks probable cause and the circumstances indicate a lack of good faith." *Holland v. City of Chicago,* 643 F.3d 248, 255 (7th Cir. 2011) (citation omitted). Not only has Plaintiff plausibly alleged that Defendants lacked probable cause, viewing the allegations and all inferences in his favor, Plaintiff has alleged circumstances indicating the lack of good faith. In particular, Plaintiff asserts that Defendants Dignan and Byrne tortured him into confessing to crimes, including bagging him and then telling him that they were going to show him how to suffocate a dope dealer. According to Plaintiff, Defendant Kelly knew that Plaintiff had been physically abused during his interrogation and that his confession was coerced and fabricated. (Compl. ¶¶ 66, 121, 127, 128, 133, 145.) As such, Plaintiff has plausibly alleged malice by contending that Defendants Dignan, Byrne, and Kelly were motivated by something other than bringing a guilty party to justice. Also, because Plaintiff has sufficiently alleged the absence of probable cause, the Court can infer malice. *See Williams v. City of Chicago,* 733 F.3d 749, 760 (7th Cir. 2013).

### C.    Termination of Proceedings in Plaintiff's Favor

Plaintiff alleges that a Circuit Court of Cook County judge vacated his convictions pursuant to the Illinois Post-Conviction Hearing Act, and that, thereafter, the State dismissed all charges against him on October 19, 2015. (*Id.* ¶¶ 116, 117.) Defendants assert that these allegations are insufficient to compel the inference that the proceedings were terminated in Plaintiff's favor. More specifically, Defendants argue that "the only logical inference" that the

State dismissed Plaintiff's claims is that further prosecution would be meaningless because the Illinois Department of Corrections released Plaintiff on parole in 2002. As Defendants are well aware, at this stage of the proceedings, the Court is required to view all reasonable inferences in Plaintiff's favor, and in doing so, Plaintiff has sufficiently alleged that the criminal proceedings were terminated in his favor – especially because the Circuit Court vacated his convictions – an allegation Defendants fail to sufficiently address. Accordingly, Plaintiff has adequately alleged his malicious prosecution claim under *Iqbal* and *Twombly*, therefore, the Court denies Defendants' motions to dismiss Plaintiff's malicious prosecution claim as alleged in Count V.

**VII.  Intentional Infliction of Emotional Distress Claim – Count VI**

In Count VI, Plaintiff brings a common law intentional infliction of emotional distress ("IIED") claim. In their motions, Defendants argue that *Heck* does not apply to this claim, and thus it is untimely under the one-year limitations period set forth in the Illinois Local Government and Governmental Employees Tort Immunity Act. *See* 745 ILCS 10/8–1. Under Illinois law, "a claim of intentional infliction of emotional distress in the course of arrest and prosecution accrues on the date of the arrest." *Bridewell v. Eberle,* 730 F.3d 672, 678 (7th Cir. 2013). In *Bridewell*, the plaintiffs challenged their arrests under the Fourth Amendment and brought state law malicious prosecution and IIED claims. *See id*. at 674-75. Although police took the *Bridewell* plaintiffs into custody after their arrests, they were never convicted. *See id.* 675. As such, the *Bridewell* decision did not discuss the accrual of an Illinois IIED claim in relation to the *Heck* rule, namely, that if a claim impugns the validity of a criminal conviction, that claim does not accrue – and the statute of limitations does not begin to run – until the plaintiff's conviction is overturned or otherwise set aside. *See Moore*, 771 F.3d at 446. Simply

put, the facts in *Bridewell* did not invoke the *Heck* framework, and thus Defendants' reliance on *Bridewell* is misplaced.

On the other hand, in support of his argument that his IIED is timely under *Heck*, Plaintiff relies on *Parish v. City of Elkhart*, 614 F.3d 677, 683 (7th Cir. 2010), in which the Seventh Circuit considered the accrual of a plaintiff's Indiana common law IIED claim in the context of *Heck*. The *Parish* court looked at plaintiff's possible remedies under Indiana's post-conviction procedures and Indiana's adoption of *Heck,* holding that the relevant timeliness inquiry is "whether the facts alleged to support [plaintiff's] claim of IIED directly attack the validity of the conviction," *Id.* at 684. The *Parish* court reasoned:

> At the heart of Parish's complaint is a claim that the defendant officers fabricated an entire case against him that led to his wrongful conviction. The factual allegations that Parish was innocent and that the officers committed perjury, falsified evidence, coerced witnesses to commit perjury, and withheld exculpatory evidence are all challenges to the conviction that would only have been proper while the conviction was still outstanding if Parish brought them through proscribed post-conviction relief channels. Therefore, under Indiana's adoption of *Heck*, Parish could not have brought these claims until his conviction was disposed of in a manner favorable to him.

*Id.* at 684.

Examining Plaintiff's well-pleaded facts as true and all inferences in his favor, Plaintiff bases his IIED claim on Defendants coercing his confession by torture, constructing and fabricating his confession, and procuring his prosecution, conviction, and imprisonment via his coerced and fabricated confession. Under these facts, Plaintiff has directly attacked the validity of his conviction. *See Parish,* 614 F.3d at 683. Also, Illinois' adoption of *Heck* – like Indiana's – bars a plaintiff from bringing a claim that is inconsistent with his valid conviction until the conviction is set aside. *See Lieberman v. Liberty Healthcare Corp.,* 408 Ill. App. 3d 1102, 1112

(4th Dist. 2011); *see also Starks v. City of Waukegan,* 946 F. Supp. 2d 780, 803 (N.D. Ill. 2013) (Illinois adopted *Heck* for state law claims). Accordingly, Plaintiff's IIED claim did not accrue until October 19, 2015, and thus it is timely under the one-year limitations period under the Tort Immunity Act, 745 ILCS 10/8–1. The Court notes that while a successful IIED claim may not necessarily impugn a plaintiff's conviction, *see Moore*, 771 F.3d at 446, under the facts of this case and in light of *Parish* and Illinois' adoption of *Heck*, Plaintiff's IIED claim is timely.[6] The Court therefore denies Defendants' motions to dismiss Count VI.

## VIII. Absolute Prosecutorial Immunity

Defendants Daley and Kelly argue that they are protected by absolute prosecutorial immunity in their role as Cook County State's Attorneys. "Prosecutors are absolutely immune from liability for damages under § 1983 for conduct that is functionally prosecutorial; this immunity is understood to broadly cover all conduct associated with the judicial phase of the criminal process." *Bianchi,* 818 F.3d at 316. Whether an individual "is protected by absolute prosecutorial immunity depends on the type of work he performed and the factual premises of the plaintiffs' claims" because a "prosecutor only enjoys absolute immunity insofar as he is 'act[ing] within the scope of his prosecutorial duties.'" *Id.* at 318 (quoting *Imbler v. Pachtman,* 424 U.S. 409, 420, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). The Supreme Court teaches that when "determining whether particular actions of government officials fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity, [courts]

---

[6] Defendants rely on the district court decision in *Phillips v. City of Chicago,* No. 14 C 9372, 2015 WL 5675529, at *7 (N.D. Ill. Sept. 24, 2015), for the proposition that the accrual rule in *Heck* does not apply to Plaintiff's IIED claim. The Court in *Phillips*, however, did not discuss the Seventh Circuit's holding in *Parish v. City of Elkhart*, 614 F.3d 677, 683 (7th Cir. 2010), nor Illinois' application of the *Heck* rule.

have applied a 'functional approach,'" looking to "the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons,* 509 U.S. 259, 269, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (internal citations omitted); *see also Van de Kamp v. Goldstein,* 555 U.S. 335, 342, 129 S.Ct. 855, 172 L.Ed.2d 706 (2009) ("immunity may not apply when a prosecutor is not acting as an officer of the court, but is instead engaged in other tasks, say, investigative or administrative tasks."). Therefore, a prosecutor involved in a conspiracy to target a criminal suspect is not protected by absolute immunity, *see Johnson v. Dossey,* 515 F.3d 778, 783 (7th Cir. 2008), nor is a prosecutor who fabricates evidence. *See Buckley,* 509 U.S. at 274-75.

### A.     Defendant Kelly

In his motion to dismiss, Defendant Kelly argues that the Court should dismiss Plaintiff's claims against him based on absolute prosecutorial immunity "because they all arise solely out of actions he undertook as an Assistant State's Attorney in the initiation of charges in the State's criminal prosecution of Plaintiff." (R. 46, Kelly Brief, at 2.) Defendant Kelly specifically argues that his involvement with Plaintiff centers on his duties as an ASA in the felony review unit, which he explains involved interviewing witnesses and suspects, reviewing evidence gathered by the police in their investigation, taking statements from suspects and witnesses, deciding what information is necessary for trial, and approving or declining felony charges. Under these duties, Defendant Kelly maintains that he was acting as a prosecutor, and thus is entitled to absolute immunity.

Plaintiff, however, alleges that Defendant Kelly did more than his assigned tasks as a felony review attorney. Construing Plaintiff's well-pleaded facts as true and all reasonable

inferences in his favor, Plaintiff asserts that Defendant Kelly encouraged, condoned, and permitted the torture that Defendants Burge, Dignan, and Byrne used to coerce his fabricated confession. Specifically, Plaintiff alleges that Defendant Kelly was part of the investigative team and participated in the coercive interrogation and confession by knowing and condoning Defendant Officers physically abusing and torturing Plaintiff to induce him to confess to a murder he did not commit. *See Wilson*, 830 F.3d at 469 ("A defendant is personally responsible 'if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent.'") (citation omitted); *Chavez,* 251 F.3d at 652 (a defendant "will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent."). Furthermore, Plaintiff asserts that it is reasonable to infer that Defendant Kelly was complicit in violating his constitutional and state law rights because when Defendant Kelly was questioning Plaintiff, it was apparent that Plaintiff had forgotten the story Defendants Dignan and Byrne had fabricated, after which Defendant Kelly relied upon Defendant Officers' notes to elicit Plaintiff's fabricated confession. Based on the detailed allegations surrounding Plaintiff's interrogation at Area 2 in January 1983, the Court can also reasonably infer that Defendant Kelly knew Plaintiff's confession was coerced in light of Plaintiff's allegations that Defendant Officers physically beat and injured him. Also, according to Plaintiff, Defendants Byrne, Dignan, and Kelly offered false and perjured testimony at his motion to suppress and trial to cover-up evidence of police torture and abuse at Area 2. Under these facts, Defendant Kelly knowingly aided and abetted Defendant Officers' constitutional violations.

Under these circumstances, Plaintiff has adequately alleged facts stating a plausible claim for relief that Defendant Kelly was not acting in his role as a prosecutor when he violated Plaintiff's rights under state and federal law. *See Whitlock,* 682 F.3d at 580 ("A prosecutor who manufactures evidence when acting in an investigatory role can cause a due process violation just as easily as a police officer"); *Fields II,* 740 F.3d at 1115 ("Since we've already held that [the prosecutor] is not entitled to absolute immunity from being sued on the federal claims against him, there is no basis for giving him absolute prosecutorial immunity from the state law claims for the same conduct alleged as a violation of Illinois tort law."); *see, e.g., Hill v. City of Chicago,* No. 06 C 6772, 2009 WL 174994, at *11 (N.D. Ill. Jan. 26, 2009) (ASA's "conduct in coercing [plaintiff] to confess and any attendant conspiracy to do so is completely 'unrelated to the preparation and initiation of judicial proceedings.'") (quoting *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003)); *see also Tillman,* 813 F.Supp.2d at 966-67 (felony review ASA not entitled to absolute immunity based on allegations that he participated in the interrogation and suppressed the truth about those events).

Defendant Kelly next argues that he is protected by qualified immunity. *See Bianchi,* 818 F.3d at 318 ("A prosecutor acting in an investigative capacity may claim only the same qualified immunity that protects police officers and other law-enforcement investigators."). When evaluating qualified immunity, courts consider two questions: (1) whether the plaintiff's allegations show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the defendant's misconduct. *See Werner v. Wall,* 836 F.3d 751, 759 (7th Cir. 2016), *Locke,* 788 F.3d at 667.

As the Court has already concluded, Defendants are not protected by qualified immunity in relation to Plaintiff's *Brady* claim. Nonetheless, Defendant Kelly argues that *Brady* violations are inherently prosecutorial, and thus he is protected by absolute immunity. Indeed, once a case passes the investigative stage and the prosecutors start preparing for trial, failure to turn over exculpatory evidence is subject to absolute immunity. *See Fields*, 672 F.3d at 513-14; *see also Johnson v. Dossey,* 878 F. Supp. 2d 905, 919 (N.D. Ill. 2012). Plaintiff's claims against Defendant Kelly, however, concern Defendant Kelly's misconduct during the investigatory stage of the proceedings, as well as his conspiratorial conduct unrelated to the prosecution of Plaintiff's claims. The Court further notes that Defendant Kelly was not the trial prosecutor. As such, this argument is without merit.

Defendant Kelly's other qualified immunity arguments attack Plaintiff's factual allegations underlying the alleged constitutional violations, which the Court must view in Plaintiff's favor for qualified immunity purposes. *See Locke,* 788 F.3d at 667. Specifically, Defendant Kelly argues that he was not personally involved in Plaintiff's fabrication of evidence and coerced confession claims. To the contrary, Plaintiff has sufficiently alleged that Defendant Kelly encouraged, condoned, and permitted the use of torture to coerce false and fabricated confessions. These facts adequately allege Defendant Kelly's personal involvement. *See Wilson*, 830 F.3d at 469; *Chavez,* 251 F.3d at 652.

Defendant Kelly's last argument is that because he is an employee of the State, Plaintiff's claims against him are against the State of Illinois, and thus sovereign immunity shields him for liability in federal court. To clarify, sovereign immunity precludes a lawsuit against an agent of the State of Illinois anywhere but in the Illinois Court of Claims unless the state's agent acts in

violation of statutory or constitutional law or in excess of his or her authority. *See Richman v. Sheahan*, 270 F.3d 430, 441 (7th Cir. 2001); *Johnson v. Root,* 812 F. Supp. 2d 914, 924 (N.D. Ill. 2011); *Healy v. Vaupel,* 133 Ill.2d 295, 309 (Ill. 1990).

As examined above, Plaintiff has sufficiently alleged that Defendant Kelly's conduct violated the United States Constitution, state law, and was outside of the scope of his employment. In fact, the Court has rejected this exact argument under similar circumstances, *see Cannon,* 2006 WL 273544, at *17, as have other courts in this district. *See Kitchen v. Burge*, No. 10 C 4093, 2012 WL 346450, at *5 (N.D. Ill. Feb. 1, 2012); *Howard v. City of Chicago*, No. 03 C 8481, 2006 WL 850954, at *6 (N.D. Ill. Mar. 24, 2006); *Orange v. Burge,* No. 04 C 0168, 2005 WL 742641, at *18 (N.D. Ill. Mar. 30, 2005); *Patterson,* 328 F.Supp.2d at 887. Therefore, Defendant Kelly's sovereign immunity argument does not shield him from liability in federal court. The Court denies Defendant Kelly's motion to dismiss.

### B.      Defendant Daley[7]

On the other hand, because Defendant Daley was the Cook County State's Attorney at the time of Plaintiff's prosecution, any decisions to initiate Plaintiff's prosecution or his other activities in his role as State's Attorney fall under the protection of absolute immunity, including knowingly using false testimony at trial and suppressing exculpatory evidence. *See Imbler,* 424 U.S. at 430-31; *see also Bianchi,* 818 F.3d at 316 ("Prosecutors are absolutely immune from liability for damages under § 1983 for conduct that is functionally prosecutorial; this immunity is understood to broadly cover all conduct associated with the judicial phase of the criminal

---

[7]   Because Plaintiff brings his claims against Defendant Daley in his individual and not official capacity, Defendant's Eleventh Amendment immunity argument is misplaced. *See Parker v. Lyons*, 757 F.3d 701, 706 (7th Cir. 2014).

process.").  Thus, Defendant Daley in his role as Cook County's State's Attorney cannot be not liable for Plaintiff's individual due process claims or his malicious prosecution claim.  *See Tillman,* 813 F.Supp.3d at 986-87; *Andrews v. Burge*, 660 F. Supp. 2d 868, 876-77 (N.D. Ill. 2009).  The Court therefore grants this aspect of Defendant Daley's motion to dismiss.

That being said, Plaintiff's Complaint also includes allegations that Defendant Daley as Chicago's Mayor was involved in a conspiracy.  In the context of a similar conspiracy claim involving Defendant Daley as Chicago's Mayor, the district court in *Tillman* explained:  "That [plaintiff's] allegations may not have been sufficient to state a substantive *Brady* violation against Mayor Daley himself does not mean they were insufficient to allege his role in a conspiracy that included *Brady* violations" because "[i]ndividual actions taken in furtherance of a conspiracy need not be illegal in order for the participant to be liable for the illegal acts performed in furtherance of the conspiracy."  *Id.* at 989 (citing *United States v. Cueto,* 151 F.3d 620, 636 (7th Cir. 1998) ("[A]cts which are themselves legal lose their legal character when they become constituent elements of an unlawful scheme.'") (citation omitted).

As discussed above, Plaintiff alleges that after his conviction and sentence, Defendants Martin, Shines, Hillard, and Needham acted in collusion with Defendant Daley (as Chicago's Mayor) and other high-ranking police officials to deflect public scrutiny of Defendant Burge's misconduct that deprived Plaintiff information regarding the scope and nature of the systemic misconduct prolonging his unlawful incarceration.  (*Id.* ¶¶ 93, 118.)  Plaintiff specifically alleges that while Defendant Daley was Mayor:  (1) he did not disclose exculpatory information in his possession from the date he resigned as State's Attorney of Cook County in 1989 until he left the Mayor's office in 2011; (2) he did not intervene at any time to direct the CPD to disclose

exculpatory information in its possession regarding Defendant Burge and detectives under his command; and (3) he did not direct the CPD to conduct a thorough and aggressive investigation of Defendants Burge, Byrne, Dignan, and the other detectives who tortured and abused African-American men while working under Defendant Burge's command. (Compl. ¶ 95.) Plaintiff also alleges that in furtherance of this conspiracy, Defendant Daley: (1) repeatedly discredited OPS findings of the systemic torture under Defendant Burge at Area 2; (2) refused to direct Defendant Martin (as CPD Superintendent) to initiate criminal investigations or disciplinary proceedings against Defendant Burge and CPD Detectives under his command; (3) rejected advise from senior staff that the City should sue Defendant Burge rather than continue to defend him in civil proceedings despite Defendant Daley's knowledge of Defendant Burge's wrongdoing; and (4) made false public statements in July 2006 in response to a Special Prosecutor's Report. (*Id.* ¶¶ 97, 103, 104, 114, 118.) These allegations sufficiently allege that Defendant Daley, as Chicago's Mayor, participated in a conspiracy to conceal evidence of police torture. *See Tillman,* 813 F.Supp.2d at 989 ("The Seventh Circuit has recognized numerous conspiracies aimed at covering-up prior illegal actions."). The Court therefore denies this aspect of Defendant Daley's motion to dismiss.

On a final note, the Court reminds the parties that arguments made for the first time in a reply brief and partial or cursory arguments made in footnotes are waived, especially when, as here, the Court granted the parties' motions to file oversized briefs. *See Thulin v. Shopko Stores Operating Co., LLC,* 771 F.3d 994, 997 (7th Cir. 2014); *United States v. Vitrano,* 747 F.3d 922, 925 (7th Cir. 2014).

## CONCLUSION

For these reasons, the Court denies the Chicago Defendants' motion to dismiss, denies

Defendants Kelly's and Cook County's motion to dismiss, and grants in part and denies in part

Defendant Daley's motion to dismiss.

**Dated:** November 28, 2016

ENTERED

**AMY J. ST EVE**
**United States District Court Judge**